Robert L. Weigel
Howard S. Hogan
Alison L. Wollin
Anne M. Coyle
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiffs Gucci America, Inc.,*
*Balenciaga S.A., Balenciaga America, Inc.,*
*Bottega Veneta S.A., Bottega Veneta Inc.,*
*Yves Saint Laurent America, Inc.,*
*Luxury Goods International (L.G.I.) S.A.,*
*and Kering S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x



GUCCI AMERICA, INC.; BALENCIAGA S.A.;
BALENCIAGA AMERICA, INC.; BOTTEGA
VENETA S.A.; BOTTEGA VENETA INC.; YVES
SAINT LAURENT AMERICA, INC.; LUXURY
GOODS INTERNATIONAL (L.G.I.) S.A.; and
KERING S.A.,

            Plaintiffs,

    -against-

ALIBABA GROUP HOLDING LTD.;
ALIBABA.COM HONG KONG LTD.;
ALIBABA.COM LTD.; ALIBABA.COM
INVESTMENT HOLDING LTD.; ALIBABA.COM
INVESTMENT LTD.; ALIBABA (CHINA)
TECHNOLOGY CO., LTD.; ALIBABA.COM, INC.;
TAOBAO HOLDING LTD.; TAOBAO CHINA
HOLDING LTD.; TAOBAO (CHINA) SOFTWARE
CO., LTD.; AND ALIPAY.COM CO., LTD.

            Defendants.

----------------------------------------------------------------X

15 CV 03784

2015 Civ. _____

**COMPLAINT**

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION .................................................................................. 1

PARTIES .............................................................................................................. 8

JURISDICTION AND VENUE ........................................................................... 13

FACTUAL BACKGROUND ............................................................................... 22

I.      Plaintiffs' Business and Marks ................................................................. 22

II.     Counterfeiting and the Internet ................................................................ 35

III.    Defendants' Business ............................................................................... 35

IV.     The Sale of Counterfeit Products Through the Alibaba Marketplaces ............................ 40

        A.      Alibaba.com ................................................................................. 42

        B.      Taobao.com ................................................................................. 59

        C.      AliExpress.com ........................................................................... 73

V.      The Alibaba Defendants' Unauthorized Sale of Plaintiffs' Marks as Keywords ............ 80

VI.     Alipay's Processing of Counterfeit Sales Through the Alibaba Marketplaces ................ 83

VII.    The Alibaba Defendants Are an Indispensable Part of the Enterprise to Sell the Counterfeit Products, Resulting in Consumer Confusion and Harm to Plaintiffs ........... 87

VIII.   The Alibaba Defendants' Unwillingness to Refrain from Trademark Infringement ........ 92

IX.     Consumer Confusion and Harm to Plaintiffs .................................................. 100

        A.      Plaintiffs' Marks As Keywords .................................................... 100

        B.      Sales of Products Bearing Plaintiffs' Marks .............................. 103

FIRST CAUSE OF ACTION AGAINST THE ALIBABA DEFENDANTS ............................ 104

SECOND CAUSE OF ACTION  AGAINST THE ALIBABA DEFENDANTS ..................... 106

THIRD CAUSE OF ACTION  AGAINST THE ALIBABA DEFENDANTS ........................ 108

FOURTH CAUSE OF ACTION AGAINST THE ALIBABA DEFENDANTS ..................... 111

FIFTH CAUSE OF ACTION AGAINST THE ALIBABA DEFENDANTS ........................... 112

SIXTH CAUSE OF ACTION AGAINST THE ALIBABA DEFENDANTS ........................... 114

SEVENTH CAUSE OF ACTION AGAINST THE ALIBABA DEFENDANTS ................... 133

EIGHTH CAUSE OF ACTION AGAINST THE ALIBABA DEFENDANTS ...................... 136

NINTH CAUSE OF ACTION AGAINST THE ALIBABA DEFENDANTS ........................ 136

TENTH CAUSE OF ACTION AGAINST THE ALIBABA DEFENDANTS ........................ 136

ELEVENTH CAUSE OF ACTION AGAINST THE ALIBABA DEFENDANTS ................. 137

Plaintiffs Gucci America, Inc. ("Gucci"), Balenciaga, S.A. and Balenciaga America, Inc. ("Balenciaga"), Bottega Veneta International S.A. and Bottega Veneta Inc. ("Bottega Veneta"), Yves Saint Laurent America, Inc. and Luxury Goods International (L.G.I.) S.A. ("YSL"), and Kering S.A. ("Kering") (collectively, "Plaintiffs"), by their attorneys, Gibson, Dunn & Crutcher, LLP ("Gibson Dunn"), for their complaint against Defendants Alibaba Group Holding Ltd. ("Alibaba Group"), Alibaba.com Hong Kong Ltd. ("Alibaba.com Hong Kong"), Alibaba.com Ltd. ("Alibaba Ltd."), Alibaba.com Investment Holding Ltd. ("Alibaba Investment Holding"), Alibaba.com Investment Ltd. ("Alibaba Investment"), Alibaba (China) Technology Co., Ltd. ("Alibaba Technology"), Alibaba.com, Inc., Taobao Holding Ltd. ("Taobao Holding"), Taobao China Holding Ltd. ("Taobao China Holding"), Taobao (China) Software Co., Ltd. ("Taobao Software"), and Alipay.com Co., Ltd. ("Alipay") (collectively, "Alibaba Defendants"), allege as follows:

## NATURE OF THE ACTION

1.     Consumers instantly recognize the various trademarks used to identify the items merchandised or manufactured by or under licenses from Plaintiffs Gucci, Balenciaga, Bottega Veneta, and YSL (collectively, the "Plaintiffs' Marks").  For decades, these famous, arbitrary, and fanciful marks have received enormous exposure in the marketplace.  Over the years, millions of consumers have been exposed to the Plaintiffs' Marks through extensive advertising campaigns, in fashion magazines and other periodicals, as depicted on television and in motion pictures, and in other forms of unsolicited media coverage.  As a result, the Plaintiffs' Marks are among the most widely-recognized trademarks in the United States, as well as among the most popular with consumers, which adds enormous value to the authentic products that bear the Plaintiffs' Marks ("Plaintiffs' Products").

2.      The Internet has opened the door for unauthorized merchants to reach a wide range of consumers in their efforts to sell counterfeit versions of the Plaintiffs' Products, which bear the Plaintiffs' Marks even though they are not manufactured, licensed, or approved by Plaintiffs ("Counterfeit Products").  To ensure that consumers make the association between the Counterfeit Products and the Plaintiffs' Products from which they were copied, the sellers of such products not only copy the designs, patterns, and color schemes associated with Plaintiffs' Products, but also expressly use Plaintiffs' Marks in their advertising and marketing and on the Counterfeit Products themselves.

3.      Hangzhou Yanbei Trading Co., Ltd., Yiwu Bothwiner Fashion Accessory Co., Ltd., Guangzhou Yongxing Leather Goods Mfg., Dongguan Huawang Leather Co., Ltd., Shen Zhen Aiers Watch Co., Ltd., Shenzhen Meigeer Watch Co., Ltd., Shenzhen Babylon Watch Co., Ltd., VANCS Where Boutique, Spring Rain Leather Goods, Celebrity Shoe, Jinlong Luxury City, Gucci Fashion Shop, Ladylidy Shop, Coco Fashion Style,  Huiming Leather Mall, Hong Kong Longitude and Latitude International Trading, Fashion Zone Ltd., Star Factory, Xiaohui Jin's Store, and John Does (collectively, "Merchant Defendants") without authorization or license from Plaintiffs, have willfully and intentionally used, reproduced, and/or copied Plaintiffs' Marks in connection with their manufacturing, distributing, exporting, importing, advertising, marketing, selling, and/or offering to sell their Counterfeit Products.  The Merchant Defendants have shipped certain Counterfeit Products to New York.  Plaintiffs previously filed an action that included claims against both the Alibaba Defendants and the Merchant Defendants under the caption *Gucci America Inc., et al. v. Alibaba Group Holding Ltd.*, No. 14 Civ. 5119 (S.D.N.Y.) (PKC), filed July 9, 2014 (the "Initial Action").  On or about July 10, 2014, the United States District Court for the Southern District of New York entered a temporary

restraining order enjoining the Merchant Defendants from engaging in trademark infringement and counterfeiting.  On or about July 25, 2014, the Court entered a preliminary injunction that adopted the operative terms of that temporary restraining order.  On or about July 24, 2014, the claims filed against the Alibaba Defendants in the Initial Action were dismissed without prejudice.  Those claims are now reasserted here.

4.      The Alibaba Defendants have created an online global marketplace on their websites Alibaba.com, AliExpress.com and Taobao.com (collectively, the "Alibaba Marketplaces") for the sale of wholesale and retail products originating from China.  The Alibaba Defendants facilitate and encourage the sale of an enormous number of Counterfeit Products through their self-described "ecosystem," which provides manufacturers, sellers, and buyers of counterfeit goods with a marketplace for such goods, and provides online marketing, credit card processing, financing, and shipping services that effectuate the sale of the Counterfeit Products.

5.      The Alibaba Defendants, a single business unit comprising the subsidiaries and related companies operating several wholesale and retail global online marketplaces and various ancillary services, knowingly make it possible for an army of counterfeiters to sell their illegal wares throughout the world, including the United States, and are compensated by the counterfeiters for enabling the illegal sale of Counterfeit Products.

6.      As set forth more fully in the body of the Complaint, the Alibaba Defendants knowingly encourage, assist, and profit from the sale of counterfeits on their online platforms. For example, the Hangzhou Yanbei Trading Company, a "Gold Supplier" and "Assessed Supplier"—a status Hangzhou Yanbei Trading Company paid the Alibaba Defendants to attain and a designation that requires the merchant's factory to be inspected by the Alibaba Defendants

or their agents.  Despite its "Gold Supplier" and "Assessed Supplier" status, this Merchant Defendant openly sold wholesale quantities of obviously fake Gucci products until it was enjoined by the Court.  Set forth below is an image of a counterfeit "Gucci" bag offered for sale by Hangzhou Yanbei Trading Company on the Alibaba Defendants' platform:



7.     The authentic Gucci bag retails for $795.  Hangzhou Yanbei Trading Company offered its counterfeit bag with Gucci's trademarks clearly visible for $2–$5 per unit, until this Merchant Defendant was enjoined by the Court.  This seller required a minimum purchase of 2,000 units per order and offered to supply up to 50,000 units per month.

8.     When a customer types in the word "replica" in the search bar on the Alibaba.com website, the Alibaba Defendants' algorithm adds the term "wristwatches" and directs the customer to merchants selling counterfeits.  The Shenzhen Meigeer Watch Co., Ltd.,  a "Gold Supplier" and "Assessed Supplier" was  openly selling replica wristwatches with Gucci's registered trademarks, including the watch shown below with Gucci's registered trademark interlocking non-facing "GG" design and green-red-green stripe, until this Merchant Defendant was enjoined by the Court.



9.      Shenzhen Meigeer Watch Co., Ltd. sold its counterfeit watch for $10–$80 per piece until this Merchant Defendant was enjoined.  This seller required a minimum purchase of 300 pieces per order and offered to supply up to 200,000 pieces per month.  The authentic Gucci watch retails for $960.

10.     These are just two examples of the numerous specific Merchant Defendants identified in the Complaint.  The Alibaba Defendants provide the marketplace, advertising, and other essential services necessary for counterfeiters to sell their Counterfeit Products to customers in the United States.

11.     The Alibaba Defendants permit and encourage numerous counterfeiters to continue to operate on the Alibaba Defendants' various platforms—even when the Alibaba Defendants have been expressly and specifically informed that the merchants are selling counterfeits, and even when the merchants themselves state openly that they are selling counterfeits.  The Complaint specifically identifies a small fraction of the counterfeiters who have openly sold Counterfeit Products on the various marketplaces run by the Alibaba Defendants.  The Alibaba Defendants knew and should have known that these specifically identifiable Counterfeit Products could not be sold without their assistance, but instead of

shutting down the counterfeiters, the Alibaba Defendants sought to profit from the counterfeiters' blatant violations of the Lanham Act.

12.    The Alibaba Defendants have knowingly assisted these counterfeiters in virtually all aspects of their illegal operations.  As the Alibaba Group states in its June 16, 2014 Amendment No. 1 to Form F-1 Registration Statement ("Form F-1"), "sellers not only build their storefronts and product catalogues on our marketplaces; they also rely on our platform for a range of essential support services to operate their businesses."[1] Among other essential support services, the Alibaba Defendants provide "Web based and mobile interfaces to manage listings, orders and customer relationship as well as cloud computing services for their enterprise resource planning . . . and client relationship management . . . ."

13.    The Alibaba Defendants assist the counterfeiters' business operations by providing marketing and logistical services for the counterfeiters' illegal enterprises.  The Alibaba Defendants cause the sales to take place by directing customers to the illegal counterfeits through their "proprietary algorithms."[2]  Alibaba Group states in its F-1 that "[o]ur data analytic and management capabilities allow us to anticipate buyer needs and tailor product offering displays matching buyers with the most relevant merchants."[3]  The Alibaba Defendants allow the counterfeiters to "extend their consumer reach through [the Alibaba Defendants'] ecosystem of marketing affiliates."[4]  The Alibaba Defendants help the counterfeiters attract customers by maintaining enormous databases containing "transactional and user behavior data generated on [their] marketplaces" that enable the Alibaba Defendants "to construct a powerful search engine

---

[1]  F-1 at 148.

[2]  F-1 at 182.

[3]  F-1 at 147.

[4]  F-1 at 148.

that generates personalized results."[5]  The Alibaba Defendants use their "online marketing technology" to "continuously improve the effectiveness of our online marketing services for [Alibaba Groups'] sellers through the use of aggregated behavioral targeting data and analytics."[6]

14.     The Alibaba Defendants sell keywords to counterfeiters, including Plaintiffs' world famous trademarks and words such as "replica."   The keywords have enabled the Merchant Defendants to attract customers to buy Counterfeit Products bearing Plaintiffs' Marks. The Alibaba Defendants have also added phrases such as "synthetic leather" to search terms and suggested terms such as "cucci" and "guchi" when "Gucci" is typed into the search bars on their various platforms to intentionally drive customers to merchants of Counterfeit Products.  The Alibaba Defendants profit from keyword sales every time a customer clicks on an advertiser's store.

15.     The Alibaba Defendants use "cloud-based deep learning" to enable sellers of counterfeits to know what keywords and other advertisements to buy in order to attract customers.  The Alibaba Defendants use their ability to analyze terabytes of data to enable the counterfeiters to "improve consumer targeting efficiency and enhance the return on investments for online marketers."[7]  In short, the Alibaba Defendants provide the marketplace, the search engine, and the advertising that allows the counterfeiters to successfully sell Counterfeit Products bearing Plaintiffs' Marks in violation of the Lanham Act.

16.     The Alibaba Defendants have also processed payments for the sale of the Counterfeit Products, including all of the Counterfeit Products described in this Complaint.  The Alibaba Defendants, specifically Alipay, accept customers' credit cards and process the sales

---

[5]  F-1 at 182.

[6]  F-1 at 182.

[7]  *Id.*

through the various credit card systems.  Pursuant to the rules of MasterCard and Visa, the

Alibaba Defendants are obliged to know the business of the merchants for which they process

credit card sales.  The Alibaba Defendants also provide logistics services to the counterfeiters to

enable them to ship their products.

17.     From the design of the online storefront through the selection and sale of

keywords and other marketing to attract customers, to processing the credit card payments to

conduct the sale, through to the shipment of goods, the Alibaba Defendants—collectively a self-

described "ecosystem"—enable and encourage counterfeiters to sell their illegal products to

customers in the United States in violation of the Lanham Act and the Racketeer Influenced and

Corrupt Organizations Act.

18.     Together, the Alibaba Defendants and the Merchant Defendants formed an

enterprise whose intentional and repeated sales of Counterfeit Products into the United States

constitute a pattern of racketeering pursuant to 18 U.S.C. § 1962(c).  Defendants' pattern of

racketeering has caused serious damage to Plaintiffs.

## PARTIES

19.     Gucci is organized and exists under the laws of New York, with its principal place

of business located at 685 Fifth Avenue, New York, New York 10022.  Gucci is the sole and

exclusive distributor in the United States of items bearing the Gucci Marks (as defined herein) on

leather goods, clothing, jewelry, accessories, home products, and related items (collectively,

"Gucci Products").

20.     Balenciaga S.A. is organized and exists under the laws of France, with its

principal place of business at 15 Rue Cassette, Paris, France 75006.  Balenciaga America, Inc. is

organized and exists under the laws of Delaware, with its principal place of business located at

50 Hartz Way, Secaucus, New Jersey 07094, and a New York office located at 542 West 22nd

Street, New York, New York 10011.  Balenciaga S.A. and Balenciaga America, Inc. are referred to collectively herein as "Balenciaga."  Balenciaga and its licensees and affiliates are the sole and exclusive distributors in the United States of items bearing the Balenciaga Marks (as defined herein) on leather goods, apparel, fragrances, jewelry, accessories, home products, and related items (collectively, the "Balenciaga Products").

21.     Bottega Veneta S.A. is organized and exits under the laws of Switzerland with its principal address at Via Industria 19, 6814 Cadempino, Switzerland.  Bottega Veneta Inc. is organized and exists under the laws of New York, with its principal place of business located at 50 Hartz Way, Secaucus, New Jersey 07094, and a New York office located at 699 Fifth Avenue, New York, New York 10022.  Bottega Veneta S.A. and Bottega Veneta Inc. are referred to herein collectively as "Bottega Veneta."  Bottega Veneta and its licensees and affiliates are the sole and exclusive distributors in the United States of items bearing the Bottega Veneta Marks (as defined herein) on leather goods, apparel, jewelry, accessories, home products, and related items (collectively, the "Bottega Veneta Products").

22.     Yves Saint Laurent America, Inc. is organized and exists under the laws of New York, with its principal place of business located at 3 East 57th Street, New York, New York 10022.  The registered owner of the YSL Marks as defined herein is Luxury Goods International (L.G.I) S.A. ("LGI"), which is organized and exists under the laws of Switzerland with its principal place of business at Via Industria 19, 6814 Cadempino, Switzerland.  YSL and its licensees and affiliates are the sole and exclusive distributors in the United States of items bearing the YSL Marks (as defined herein) on leather goods, apparel, jewelry, accessories, home products, and related items (collectively, the "YSL Products").  LGI and YSL are referred to collectively as the "YSL Plaintiffs."

23.     Kering, S.A. is organized and exists under the laws of France, with its principal place of business located at 10 Avenue Hoche, Cedex 08, Paris, France 75381.

24.     Alibaba Group Holding Ltd. ("Alibaba Group") is organized and exists under the laws of the Cayman Islands, with its principal address at 969 West Wen Yi Road, Yu Hang District, Hangzhou 311121, People's Republic of China ("PRC").  Alibaba Group has a registered agent for service of process, Corporation Service Company, at the following address: 1180 Avenue of the Americas, Suite 210, New York, New York 10036.[8]

25.     Alibaba.com Ltd. ("Alibaba Ltd.") is organized and exists under the laws of the Cayman Islands, with its principal address at 699 Wang Shang Road, Binjiang District, Hangzhou 310052, PRC.[9]  Alibaba Ltd. is a wholly-owned subsidiary of Alibaba Group and the indirect holding company of the PRC subsidiaries relating to Alibaba Group's Alibaba.com, 1688.com, and AliExpress businesses.[10]

26.     Alibaba.com Hong Kong Ltd. ("Alibaba.com Hong Kong") is organized and exists under the laws of Hong Kong, with its principal place of business at 26/F Tower One, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong.  Alibaba.com Hong Kong is wholly owned by Alibaba Ltd.  Alibaba.com Hong Kong operates the websites www.alibaba.com and www.aliexpress.com.

27.     Alibaba.com Investment Holding Ltd. ("Alibaba Investment Holding") is organized and exists under the laws of the British Virgin Islands, with an address at Trident Trust Co. (B.V.I.) Ltd., Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands VG1110.  Alibaba Investment Holding is a direct, wholly-owned subsidiary of Alibaba Ltd. and

---

[8]   F-1 at 11, 71.

[9]   http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=428457.

[10]   F-1 at 76.

a lower-level holding company of the PRC subsidiaries relating to Alibaba Group's Alibaba.com, 1688.com, and AliExpress businesses.[11]

28.     Alibaba.com Investment Ltd. ("Alibaba Investment") is organized and exists under the laws of the British Virgin Islands, with an address at Trident Trust Co. (B.V.I.) Ltd., Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands VG1110.  Alibaba Investment is the principal holding company for Alibaba's strategic investments.[12]

29.     Alibaba (China) Technology Co., Ltd. ("Alibaba Technology") is organized and exists under the laws of, on information and belief, PRC, with an address at 699 Wang Shang Road, Binjiang District, Hangzhou 310052, PRC.  Alibaba Technology is an entity primarily engaged in the operations of Alibaba Group's wholesale marketplaces.[13]

30.     Alibaba.com, Inc. ("Alibaba Inc.") is organized and exists under the laws of Delaware, with its principal address at 400 S. El Camino Real, Suite 400, San Mateo, CA 94402. Alibaba Inc. is a subsidiary of Alibaba Ltd. and operates as a "B2B e-commerce company" and also focuses on technology maintenance, marketing and administrative services.[14]

31.     Taobao Holding Ltd. ("Taobao Holding") is organized and exists under the laws of the Cayman Islands, with an address at Trident Trust Co. (Cayman) Ltd., One Capital Place, P.O. Box 847, Grand Cayman KY1-1103, Cayman Islands.  Taobao Holding is a wholly-owned subsidiary of Alibaba Group and the indirect holding company of the PRC subsidiaries relating to the Taobao Marketplace and Tmall platforms.[15]

---

[11]   *Id.*

[12]   *Id.*

[13]   F-1 at F-37.

[14]   http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=38707079.

[15]   F-1 at 75.

32.     Taobao China Holding Ltd. ("Taobao China Holding") is organized and exists under the laws of Hong Kong, with an address at 26/F Tower One, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong.  Taobao China Holding is the direct wholly-owned subsidiary of Taobao Holding.  Taobao China Holding is a direct holding company of the PRC subsidiaries relating to the Taobao Marketplace and Tmall platforms, and is the operating entity for the overseas business of Taobao Marketplace and Tmall.[16]

33.     Taobao (China) Software Co., Ltd. ("Taobao Software") is organized and exists under the laws of, on information and belief, PRC, with its registered address, on information and belief, at Jingfeng Village, Wuchang Subdistrict, Yuhang District, Hangzhou Zhejiang 310013, PRC.  Taobao Software is engaged in the operations of the Taobao Marketplace.[17]

34.     Alipay.com Co., Ltd. ("Alipay") is organized and exists under the laws of the PRC, with its registered address, on information and belief, at Unit 108E, 98 EShan Road 91/Lane , Pudong New District, Shanghai  200127, PRC.   Alipay is a company related to the Alibaba Group and has a long-term contractual relationship with the Alibaba Group through which it provides payment processing services for the Alibaba Marketplaces.[18]

35.     Defendants Alibaba Group, Alibaba.com Hong Kong, Alibaba Ltd., Alibaba Investment Holding, Alibaba Investment, Alibaba Technology, Alibaba Inc., Taobao Holding, Taobao China Holding, Taobao Software, and Alipay are collectively referred to herein as the "Alibaba Defendants."  The Alibaba Defendants are all part of a self-described "ecosystem."

---

[16]   *Id.*

[17]   F1 at F-37.

[18]   F-1 at 11, 25.

## JURISDICTION AND VENUE

36.     This is an action arising under the Trademark Act of 1946, 15 U.S.C. § 1051, <u>et</u> <u>seq.</u> (the "Lanham Act"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), <u>et seq.</u> ("RICO"), and the laws of the State of New York.

37.     This Court has federal question jurisdiction over this action under 15 U.S.C. § 1121(a) (action arising under the Lanham Act), 28 U.S.C. §§ 1331 (federal question), 1338(a) (any Act of Congress relating to patents or trademarks), and 1338(b) (action asserting claim of unfair competition joined with a substantial and related claim under the trademark law).  This Court has supplemental jurisdiction over all other claims asserted herein under 28 U.S.C. § 1367(a) because those claims are so closely related to the federal claims brought herein as to form part of the same case or controversy.

38.     Personal jurisdiction is proper over all Defendants in this district pursuant to N.Y.C.P.L.R. § 302(a)(1) and  § 302(a)(3), or, in the alternative, Rule 4(k) of the Federal Rules of Civil Procedure, by virtue of the following facts:

    a.  Defendants regularly conduct, transact, or solicit business within this District, engage in other persistent courses of conduct, and/or derive substantial revenue from goods and/or services used or consumed within this District; Defendants regularly and systematically direct electronic activity into the State of New York with the manifest intent of engaging in business within this District; Defendants conduct, transact, and solicit business in this District and derive substantial revenue from goods and/or services used or consumed within this District in connection with the unlawful conduct complained of herein; and the unlawful conduct engaged in by Defendants, complained of herein, caused and continues to cause injury to Plaintiffs within this District.

b.  Defendants derive substantial revenue from international and interstate commerce, including with the United States, in return for the services they provide to legitimate and illegitimate Internet merchants:

    i.  Defendants generated $780 million in international commerce in the year ended March 31, 2014.[19]

c.  Alibaba.com, an English-language wholesale marketplace for global trade owned and operated by the Alibaba Defendants, hosts buyers and sellers from the United States.  United States manufacturers and distributors sell their products on Alibaba.com and the United States is one of the three biggest markets for buyers on Alibaba.com.[20]

d.  AliExpress.com, a global consumer marketplace and English-language site owned and operated by the Alibaba Defendants, sells products from wholesalers and manufacturers in China to consumers in the United States.  In the three months ended March 31, 2014, the United States was one of the three biggest markets for buyers on AliExpress.com.[21]

e.  Goods purchased on Alibaba.com and AliExpress.com are regularly shipped into the United States, including into the State of New York.

f.   Goods purchased from Taobao.com, a Chinese-language website owned and operated by the Alibaba Defendants, are regularly shipped into the United States, including into the State of New York.

---

[19]   F-1 at 94.

[20]   F-1 at 168.

[21]   F-1 at 166.

g.   Taobao Marketplace authorizes agents to make purchases on behalf of buyers from the United States and to ship goods into the United States, including into the State of New York.

h.   Taobao Marketplace advertises an "International Forwarding Service" to ship goods purchased from Taobao.com internationally.  Taobao Marketplace notes that certain goods are prohibited from international shipment, including "reactionary" or "obscene" materials, but notably does not state any prohibition against counterfeit goods.

i.   Alibaba.com and AliExpress.com target customers in the United States through online marketing and advertising—for example and without limitation, through pop-up advertisements targeted to Internet users in the United States, including users in the State of New York.

j.   Taobao.com displays a pop up ad displaying an American flag and a message in Chinese characters which, translated, reads "Dear, now you can shop on Taobao.com from the US."  There is a link that reads "more information" in Chinese and navigates the browser to a page with more information about shipping and shopping tips, emphasizing how easy it is to shop from the U.S.



k.   On information and belief, millions of web users from the United States (including the State of New York) visit Defendants' marketplaces every day.

    i.   Approximately 10.1% of Alibaba.com's visitors are from the United States.  Alibaba.com is the 154th most visited site in the United States.[22]

    ii.   Approximately 7.4% of AliExpress.com's visitors are from the United States.  AliExpress.com is the 244th most visited site in the United States.[23]

    iii.   Taobao.com has approximately 25 million visitors per day.  Approximately 1% of visitors on Taobao.com, or 250,000, are from the United States.[24]

    iv.   There are approximately 2.9 million Chinese speakers in the United States, including more than 500,000 Chinese speakers in New York.

    v.   Taobao.com is the 381st most visited site in the United States.[25]  By comparison, popular sites such as Myspace.com, Travelocity.com, and Abc.go.com (ABC's official site), rank 380th, 385th, and 388th, respectively.

l.  Taobao.com's official mobile app is available for download in the United States.

m.  Defendants maintain places of business in the United States, including at least the following offices in the United States:

    i.   Alibaba Group maintains data center and logistics facilities in the United States.[26]

---

[22] http://www.alexa.com/siteinfo/alibaba.com.  The Alexa.com statistics cited herein reflect information available in June 2014.

[23] http://www.alexa.com/siteinfo/aliexpress.com.

[24] http://www.alexa.com/siteinfo/taobao.com.

[25] http://www.alexa.com/siteinfo/taobao.com.

[26] *Id.*

ii. Specifically, Alibaba.com, Inc. has an office in Santa Clara, California, with its address listed as 400 S. El Camino Real, Suite 400, San Mateo CA 94402 .[27]  The Alibaba Defendants have referred to Alibaba.com, Inc. and their California address as their "U.S. Headquarters."

iii. Alipay has an office in Santa Clara, California, with its address listed as 3945 Freedom Circle, Suite 600, Santa Clara, California 95054.

iv. Alibaba Inc. has a registered agent at 160 Greentree Drive, Dover, Delaware 19904.

v. As of June 11, 2014, the Alibaba Defendants launched 11main.com, a United States invite-only consumer marketplace and English-language site.[28]  United States specialty shops and boutiques will sell their products on 11main.com to United States buyers.[29]  11main.com is headquartered in California, with its address listed as 360 East 6th Street, Chico, California, 95928.

n. Alibaba Group has made substantial investments in companies in the United States:

i. In March 2014, Alibaba Group purchased a 20% equity interest (on a fully-diluted basis) in TangoMe, Inc., "a leader in mobile messaging services based in the United States" for $200 million.[30]  In April 2014,

---

[27]   http://www.alibabagroup.com/en/contact/offices.

[28]   https://11main.com/preview.

[29]   http://www.forbes.com/sites/ryanmac/2014/06/11/alibaba-launches-11-main-to-grow-u-s-presence-before-its-record-american-ipo/.

[30]   F-1 at 99.

Alibaba Group invested an additional $17 million in TangoMe, Inc. to maintain its 20% equity interest.[31]

    ii. In March 2014 (and announced on April 2, 2014), Alibaba Group participated in a $250 million fund-raising round for Lyft, "one of the big players in the nascent-but-booming ride-sharing industry" and a main competitor of Uber.[32]

    iii. In January 2014, Alibaba Group invested $15 million in 1stdibs, a "New York based luxury e-commerce site" that "links more than 1,500 international dealers of high-end antiques, vintage furniture and design, art, jewelry, fashion and homes to consumers."[33]

    iv. In the nine months ended December 31, 2013, Alibaba Group acquired shares in ShopRunner, a U.S. company which "operates an online platform for buyers."[34]  Alibaba Group invested $202 million for a 39% equity interest in the company.[35]

o. On May 6, 2014, Alibaba Group filed its Form F-1 with the U.S. Securities and Exchange Commission for an Initial Public Offering ("IPO") of its shares in the United States to be listed on the New York Stock Exchange.  The Form F-1 states that Alibaba Group planned to raise $1 billion from the sale of its shares in the United States, although news reports estimated that the offering would raise $20–

---

[31] *Id.*

[32] http://dealbook.nytimes.com/2014/04/02/lyft-raises-250-million-from-alibaba-third-point-and-others/.

[33] http://www.avcj.com/avcj/news/2325087/china-s-alibaba-group-makes-usd15-million-investment-in-1stdibs.

[34] F-1 at F-57.

[35] F-1 at 57, 58.

$26 billion and may be the largest IPO in United States history.[36]  *Forbes*

magazine reported that the Initial Public Offering raised approximately $25

billion and described the IPO as the "Largest Global IPO Ever" and "the biggest

in the world."[37]

p.   The Alibaba Defendants are all alter egos of each other:

    i.   The Alibaba Defendants operate as a single unit, sharing common

ownership, the Alibaba Group, and a unity of interest, "to make it easy to

do business anywhere."[38]  Indeed, according to Alibaba Group's Form F-1,

Alibaba Group "operate[s] our Internet businesses and other businesses in

which foreign investment is restricted or prohibited in the PRC through

wholly-foreign owned enterprises, majority-owned entities and variable

interest entities . . . These contractual arrangements collectively enable us

to exercise effective control over, and realize substantially all of the

economic risks and benefits arising from, the variable interest entities."[39]

Alibaba Group defines the terms "we," "us," "our company," and "our" as

including "Alibaba Group Holding Limited and its consolidated

subsidiaries and its affiliated consolidated entities, including our variable

interest entities and their subsidiaries."[40]  As set forth in Alibaba Group's

Form F-1, the Alibaba Defendants constitute "a single operating and

---

[36]   http://moneymorning.com/2014/07/01/why-alibaba-ipo-value-estimates-keep-climbing-up-to-221-billion/.

[37]   http://www.forbes.com/sites/ryanmac/2014/09/22/alibaba-claims-title-for-largest-global-ipo-ever-with-extra-share-sales/

[38]   F-1 at 1.

[39]   F-1 at 10.

[40]   F-1 at 12.

reporting segment, namely the provision of online and mobile commerce and related services" and Alibaba Group does "not allocate operating costs or assets to its business units."[41]  Accordingly, the Alibaba Defendants operate as a single unit and each of the Alibaba Defendants is an agent of the other Alibaba Defendants.

    ii.  The Alibaba Group controls the other Alibaba Defendants, i.e., their marketing and operational policies.

    iii.  Certain Alibaba Defendants have maintained common office space and addresses, *i.e.*, Alibaba.com and Alipay shared an address at 3945 Freedom Circle, Suite 600, Santa Clara, California 95054.

    iv.  On information and belief, the Alibaba Defendant subsidiaries are financially dependent on their parent, the Alibaba Group.

q.  Alibaba Group has caused its the stock to be listed on the New York Stock Exchange in an Initial Public Offering that raised approximately $25 billion.  On information and belief, a significant reason that the Alibaba Defendants' IPO was so successful was that the Alibaba Defendants offered investors the opportunity to invest in the Alibaba Defendants' collective enterprise as a single unit, including but not limited to the representations listed above.

r.  Alipay regularly processes transactions made through the Alibaba Marketplaces that involve buyers located in the United States (including New York) and communicates with those U.S. buyers and confirms their purchases via SMS text message.  In addition, Alipay sends SMS text messages to buyers from various

---

[41]   F-1, Note 2(f) to Audited Financials at F-18.

U.S. cell phone numbers, including and without limitation numbers from New York, Georgia, Illinois, Texas, California, North Carolina, Tennessee, and Louisiana.

s.  The Alibaba Defendants knowingly operate a marketplace for Counterfeit Products with the knowledge and intent that such Counterfeit Products (i) will ultimately be offered to consumers in New York and throughout the United States; (ii) infringe the rights of intellectual property owners in New York and throughout the United States, including but not limited to Plaintiffs; (iii) cause substantial consumer confusion among consumers in New York and throughout the United States; and (iv) cause the harm alleged herein that results from sales of Counterfeit Products in New York and throughout the United States, including but not limited to the harm caused to Plaintiffs who have their principal place of business or substantial operations in New York.

t.  On information and belief, the Alibaba Defendants are aware that even though many of the Counterfeit Products that are sold through the Alibaba Marketplaces are purchased by customers who may reside in China, the ultimate destination for a substantial number of those sales are re-sellers and consumers in the United States.  On information and belief, the Alibaba Defendants know that a substantial percentage of online merchants that offer Counterfeit Products to U.S. consumers supply and maintain their inventory of Counterfeit Products by purchasing them through the Alibaba Marketplaces.

u.   All Defendants are aware that Plaintiffs maintain principal places of business and/or substantial operations in New York and that the trademark infringements and counterfeiting alleged herein will cause injury to Plaintiffs in New York.

39.   Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## FACTUAL BACKGROUND

### I.   Plaintiffs' Business and Marks

40.   The Gucci, Balenciaga, Bottega Veneta, and YSL brands are enormously popular with the general public.  Plaintiffs' advertising, promotional, and marketing efforts have resulted in widespread and favorable public acceptance and recognition of their respective brands.  As a result, Plaintiffs' Marks have become famous and highly valuable, possessing strong secondary meaning among consumers.

## GUCCI

41.   Gucci is the owner of the right, title and interest in and to, *inter alia*, the following federally registered trademarks and/or service marks:

| Mark | Reg./Serial No. | Date of Registration |
|------|------|------|
| GUCCI | 876,292<br>959,338<br>972,078<br>1,168,477<br>1,200,991<br>1,321,864<br>1,340,599<br>1,169,019<br>4,407,149<br>1,202,802 | 09/09/1969<br>05/22/1973<br>10/30/1973<br>09/08/1981<br>07/13/1982<br>02/26/1985<br>06/11/1985<br>09/15/1981<br>09/24/2013<br>07/27/1982 |
| GUCCI<br> | 3,061,918<br>4,555,556 | 02/28/2006<br>06/24/2014 |
| NON-INTERLOCKING GG MONOGRAM<br> | 1,106,722<br>1,107,311<br>3,378,755 | 11/21/1978<br>11/28/1978<br>02/05/2008 |
| GUCCI CREST<br> | 1,097,483<br>1,097,555<br>1,112,601<br>1,132,675<br>3,660,040 | 07/25/1978<br>07/25/1978<br>02/06/1979<br>04/08/1980<br>07/28/2009 |
| GREEN-RED-GREEN STRIPE<br> | 1,122,780<br>1,123,224<br>1,483,526 | 07/24/1979<br>07/31/1979<br>04/05/1988 |

| | | |
|---|---|---|
| INTERLOCKING FACING GG DESIGN  | 1,158,170<br>1,464,522<br>3,376,129<br>3,391,739<br>4,454,342 | 06/23/1981<br>11/10/1987<br>01/29/2008<br>05/4/2008<br>12/24/2013 |
| INTERLOCKING NON-FACING GG DESIGN  | 3,039,629<br>3,039,630<br>3,039,631<br>4,407,197<br>3,470,140 | 01/10/2006<br>01/10/2006<br>01/10/2006<br>09/24/2013<br>07/22/2008 |
| SQUARE G  | 2,042,805<br>3,037,082<br>2,234,272 | 03/11/1997<br>01/3/2006<br>03/23/1999 |
| REPEATING GG DESIGN  | 2,680,237<br>3,072,549<br>3,072,547 | 01/28/2003<br>03/28/2006<br>03/28/2006 |
| REPEATING GG DESIGN  | 4,229,081<br>4,230,191<br>4,349,908<br>4,399,108<br>4,411,218 | 10/23/2012<br>10/23/2012<br>06/11/2013<br>09/10/2013<br>10/01/2013 |

| HALF HORSEBIT | 3,238,962 | 05/08/2007 |
| :-- | :-: | :-: |
|  | | |

42.     Annexed hereto as Exhibit 1 are true and correct copies of the United States
Patent and Trademark Office ("PTO") registration certificates evidencing Gucci's ownership of
these trademarks and printouts from the PTO's website setting forth the status of these
trademarks.  Each mark was first used in commerce on or about the first date of use set forth in
Exhibit 1.  All of the registrations set forth in Exhibit 1 are valid, subsisting, unrevoked, and
uncancelled.  Additionally, many of these registrations are incontestable.  Gucci also owns
common law rights in the above and other marks for use in connection with the Gucci Products.
These registered and common law trademarks are collectively referred to as the "Gucci Marks."

43.     The Gucci Marks are in full force and effect.  Gucci has never abandoned the
Gucci Marks nor has Gucci ever abandoned the goodwill of its businesses in connection thereto.
Gucci intends to continue to preserve and maintain its rights with respect to the Gucci Marks.

44.     Gucci's website offers various types of products for sale to Internet users,
including but not limited to bags, shoes, watches, wallets, belts, sunglasses, accessories, luggage,
and hats.  As to its handbags, Gucci categorizes its handbags into at least seven different types:
(1) clutches; (2) evening; (3) hobo bags; (4) shoulder bags; (5) top handles; (6) totes; and
(7) exotics.  Each type of handbag has a different appearance, function, and purpose.  Shown
below is a true and accurate screenshot of Gucci's website at www.gucci.com, showing the
different types of handbags sold by Gucci.



45.     As to its shoes, Gucci categorizes its women's shoes alone into at least seven different types:  (1) pumps; (2) sandals; (3) moccasins and loafers; (4) flats and ballet flats; (5) sneakers; and (6) wedges.  Shown below is a true and accurate screenshot of Gucci's website at www.gucci.com, showing the different types of women's shoes sold by Gucci.



46.     As to its watches, Gucci categorizes its women's watches alone into at least seven different types:  (1) oversized; (2) diamonds; (3) chronograph; (4) stainless steel; (5) digital;

(6) leather; and (7) sport.  Shown below is a true and accurate screenshot of Gucci's website at www.gucci.com, showing the different types of women's watches sold by Gucci.



**BALENCIAGA**

47.   Balenciaga is the owner of the right, title, and interest in and to, *inter alia*, the following federally registered trademarks and/or service marks:

| Mark | Reg./Serial No. | Date of Registration |
|---|---|---|
| BALENCIAGA | 3,044,207 | 01/17/2006 |
|  | 3,344,631 | 11/27/2007 |
| BALENCIAGA IN STYLIZED FORM **BALENCIAGA** | 1,018,311 | 08/12/1975 |
| Design | 3,257,913 | 07/03/2007 |

48.     Annexed hereto as Exhibit 2 are true and correct copies of the PTO registration certificates evidencing Balenciaga's ownership of these trademarks and printouts from the PTO's website setting forth the status of these trademarks.  Each mark was first used in commerce on or about the first date of use set forth in Exhibit 2.  All of the registrations set forth in Exhibit 2 are valid, subsisting, unrevoked, and uncancelled.  Additionally, many of these registrations are incontestable.  Balenciaga also owns common law rights in the above and other marks for use in connection with the Balenciaga Products.  These registered and common law trademarks are collectively referred to as the "Balenciaga Marks."

49.     The Balenciaga Marks are in full force and effect.  Balenciaga has never abandoned the Balenciaga Marks nor has Balenciaga ever abandoned the goodwill of its businesses in connection thereto.  Balenciaga intends to continue to preserve and maintain its rights with respect to the Balenciaga Marks.

50.     In 2008, Balenciaga launched an e-commerce component to its website in the United States.  Balenciaga's website offers various types of products for sale to Internet users, including but not limited to bags, shoes, clothing, bracelets, wallets, sunglasses, and fragrances. As to its bags, Balenciaga's website categorizes its handbags into at least 5 different types: (1) backpacks; (2) briefcases; (3) cross body bags; (4) shoulder bags; and (5) totes.  Each type of handbag has a different appearance, function, and purpose.  Shown below is a true and accurate screenshot of Balenciaga's website at www.balenciaga.com, showing the different types of handbags sold by Balenciaga.



51.     As to its shoes, Balenciaga categorizes its women's shoes alone into at least five different types:  (1) ankle boots; (2) flats; (3) lace ups; (4) moccasins; and (5) sandals.  Shown below is a true and accurate screenshot of Balenciaga's website at www.balenciaga.com, showing the different types of women's shoes sold by Balenciaga.



**BOTTEGA VENETA**

52.    Bottega Veneta is the owner of the right, title, and interest in and to, *inter alia*, the following federally registered trademarks and/or service marks:

| Mark | Reg./Serial No. | Date of Registration |
|---|---|---|
| BOTTEGA VENETA<br><br>BOTTEGA VENETA | 3,454,021 | 06/24/2008 |
| BOTTEGA VENETA | 1,086,395<br>3,207,024 | 02/28/1978<br>02/13/2007 |
| <br>Intrecciato design | 4,527,371 | 5/13/2014 |

53.    Annexed hereto as Exhibit 3 are true and correct copies of the PTO registration certificates evidencing Bottega Veneta's ownership of these trademarks and printouts from the PTO's website setting forth the status of these trademarks.  Each mark was first used in commerce on or about the first date of use set forth in Exhibit 3.  All of the registrations set forth in Exhibit 3 are valid, subsisting, unrevoked, and uncancelled.  Additionally, many of these registrations are incontestable.  Bottega Veneta also owns common law rights in the above and other marks for use in connection with the Bottega Veneta Products.  These registered and common law trademarks are collectively referred to as the "Bottega Veneta Marks."

54.    The Bottega Veneta Marks are in full force and effect.  Bottega Veneta has never abandoned the Bottega Veneta Marks nor has Bottega Veneta ever abandoned the goodwill of its

businesses in connection thereto.  Bottega Veneta intends to continue to preserve and maintain its rights with respect to the Bottega Veneta Marks.

55.    Bottega Veneta's website offers various types of products for sale to Internet users, including but not limited to bags, shoes, clothing, belts, wallets, sunglasses, and jewelry. As to its bags, Bottega Veneta classifies its handbags into at least six categories: (1) clutches; (2) crossbody bags; (3) shoulder and hobo bags; (4) top handle bags; (5) tote bags; and (6) trolleys and carry-on bags.  Each type of handbag has a different appearance, function, and purpose. Shown below is a true and accurate screenshot of Bottega Veneta's website at www.Bottegaveneta.com, displaying the various categories of handbags offered for sale by Bottega Veneta.



56.    As to its shoes, Bottega Veneta categorizes its women's shoes alone into at least three different types:  (1) boots and ankle boots; (2) flats; and (3) pumps and sandals.  Shown below is a true and accurate screenshot of Bottega Veneta's website at www.bottegaveneta.com, showing the different types of women's shoes sold by Bottega Veneta.



**YSL**

57.    LGI is the owner of the right, title, and interest in and to, *inter alia*, the following federally registered trademarks and/or service marks:

| Mark | Reg./Serial No. | Date of Registration |
|------|-----------------|----------------------|
| YVES SAINT LAURENT | 1,711,127 | 09/01/1992 |
| YVES SAINT LAURENT | 1,745,483 | 01/12/1983 |
| YVES SAINT LAURENT | 901,660<br>1,712,998 | 11/03/1978<br>09/08/1992 |
| YSL | 1,712,999 | 09/08/1992 |

58.    Annexed hereto as Exhibit 4 are true and correct copies of the PTO registration certificates evidencing LGI's ownership of these trademarks and printouts from the PTO's website setting forth the status of these trademarks.  Each mark was first used in commerce on or

about the first date of use set forth in Exhibit 4.  All of the registrations set forth in Exhibit 4 are valid, subsisting, unrevoked, and uncancelled.  Additionally, many of these registrations are incontestable.  The YSL Plaintiffs also own common law rights in the above and other marks for use in connection with the YSL Products.  These registered and common law trademarks are collectively referred to as the "YSL Marks."

59.     The YSL Marks are in full force and effect.  The YSL Plaintiffs have never abandoned the YSL Marks nor have the YSL Plaintiffs ever abandoned the goodwill of their businesses in connection thereto.  The YSL Plaintiffs intend to continue to preserve and maintain their rights with respect to the YSL Marks.

60.     YSL's website offers various types of products for sale to Internet users, including but not limited to bags, shoes, clothing, belts, wallets, sunglasses, and jewelry.  As to its clothing, YSL classifies its men's clothing alone into at least nine categories: (1) leather; (2) denim; (3) t-shirts and polos; (4) sweatshirts; (5) knitwear; (6) shirts; (7) blazers; (8) pants; and (9) outerwear.  Each type of men's clothing has a different appearance, function, and purpose. Shown below is a true and accurate screenshot of YSL's website at www.ysl.com, displaying the various categories of men's clothing offered for sale by YSL.



61.    The Gucci, Balenciaga, Bottega Veneta, and YSL Marks have been widely promoted, both in the United States and throughout the world.  Plaintiffs' Marks are among the world's most famous and widely recognized, and the public and consumers have come to recognize that Plaintiffs' Products originate exclusively with Plaintiffs.

62.    Plaintiffs each maintain strict quality control standards for all of their respective products.  Customers, potential customers, and other members of the public and industry associate Plaintiffs' Products with exceptional materials, style, and workmanship.  Plaintiffs' Products are among the most popular luxury products offered for sale in the United States.  On information and belief, many consumers purchase Plaintiffs' Products because of Plaintiffs' reputation for quality.

63.    Plaintiffs' Products are displayed in their respective advertising and promotional materials.  To date, Plaintiffs have spent hundreds of millions of dollars on advertising and promoting their respective marks and products, and Plaintiffs, their predecessors-in-interest, and their affiliated companies have enjoyed billions of dollars in sales.

64.    Plaintiffs' continuous and broad use of their respective marks has expanded their renown and enabled Plaintiffs to achieve fame and celebrity in their various product markets. Plaintiffs' reputations are a direct result of their extensive advertising and promotion, concomitant widespread sales, the care and skill utilized in the manufacturing of their products, the uniform high quality of such products sold under or in connection with Plaintiffs' Marks, and the public acceptance thereof.  Plaintiffs have created invaluable goodwill throughout the United States and elsewhere by selling products of dependable quality.  Based on the extensive sales of the Plaintiffs' Products and the wide popularity of such products, Plaintiffs' Marks have developed a secondary meaning and significance in the minds of the purchasing public, and the

services and products utilizing and/or bearing such marks and names are immediately identified with Plaintiffs by the purchasing public.

## II.    Counterfeiting and the Internet

65.    Perhaps the single greatest threat to brand owners such as Plaintiffs is the global counterfeiting trade.

66.    Reports introduced into the Congressional Record indicate that counterfeiting costs U.S. businesses between $200 and $250 billion every year and results in 750,000 lost jobs.[42]  Congress has recognized that counterfeits not only present "'grave risks to the health and safety of consumers of these articles," but have a "'dire effect on the economy'" as well.  S. Rep. No. 104-177, at 2 (1995) (quoting H.R. Rep. 98-997, at 5-6 (1984)).

67.    The Internet has become an increasingly popular way to market counterfeit products from China to consumers globally and in the United States by providing increased access to customers and allowing the infringing goods to be shipped in small quantities to better evade detection by customs and other law enforcement organs.  The lure of the Internet is easy to understand from the counterfeiters' perspective:  there is a minimal cost for operating a website, a decreased risk of prosecution and, if the counterfeiters are forced to shut down one online store, they can simply open another.

## III.    Defendants' Business

68.    Alibaba.com is a global online wholesale marketplace owned and operated by the Alibaba Group.  It was founded in Hangzhou, China in 1999 by Jack Ma and seventeen partners. Alibaba.com is an English-language wholesale marketplace that connects exporters in China

---

[42]  S. Rep. No. 104-177, at 2.

with global buyers.[43]  The website was founded "to help small exporters engaged in manufacturing and trading, primarily located in China, to reach global buyers."[44]  In 2013, Alibaba.com was China's largest global online wholesale marketplace by revenue.[45]

69.     The Alibaba Defendants also operate the global online retail marketplaces Taobao Marketplace and AliExpress.com.[46]  Depicted below is a graphic taken from Alibaba Group's Form F-1 representing the Alibaba Defendant's various businesses.



---

[43]  F-1 at 74.

[44]  *Id.*

[45]  F-1 at 1.

[46]  F-1 at 1.

70. Taobao Marketplace is a consumer-to-consumer ("C2C") online marketplace and the largest online shopping platform in China.[47]

71. AliExpress is a global online consumer marketplace that enables consumers worldwide to purchase products directly from manufacturers and wholesalers in China "at attractive prices."[48] AliExpress' merchants are primarily small and medium-sized businesses in China. AliExpress is an English-language site; it also operates two local language sites in Russia and Brazil. In the three months ending March 31, 2014, AliExpress' most active buyers were from the United States, Russia, and Brazil.[49]

72. Set forth below is a graphic of the Alibaba Defendants' online marketplaces, as depicted in the Alibaba Group Form F-1.



---

[47] F-1 at 1, 74.

[48] F-1 at 146.

[49] F-1 at 166.

73.     The Alibaba Defendants have employees in the United States and their online platforms reach Internet users worldwide, including Internet users located in the United States.[50]

74.     The Alibaba Defendants have developed what they describe as an "ecosystem" around their online and mobile platforms that "includes buyers, sellers, third-party service providers, strategic alliance partners, and investee companies."[51]  In its 2014 Form F-1, Alibaba Group states that it believes this "ecosystem drives the livelihood of many of the sellers and third-party providers, and as a result the interests of these participants are aligned with [the Alibaba Defendants' interests] to ensure the continued success of [their] ecosystem."[52]  Set forth below is a graphic of the Alibaba Defendants' "ecosystem," as depicted in the Alibaba Group Form F-1.



---

[50]   LinkedIn Online Marketing Manager, Taobao International, Job Description, *available at* https://www.linkedin.com/jobs2/view/10396095?_mSplash=1.

[51]   F-1 at 1.

[52]   F-1 at 142.

75.     The Alibaba Defendants derive revenue primarily from:  (1) the online marketing services offered through their proprietary marketing platform, Alimama; (2) commissions charged for online transactions; and (3) fees charged for their provision of online services. Additional sources of revenue are membership fees and fees charged for both cloud computing and value-added services.  In the nine months ending December 31, 2013, Alibaba Group generated $6.5 billion in revenue and $2.9 billion in net income, and was the largest online and mobile commerce company in the world by gross merchandise volume in 2013.[53]  In the twelve months ended December 31, 2013, the Alibaba Marketplaces generated a combined $248 billion in GMV, which is more than the combined GMV of Amazon.com, Inc. and eBay Inc.[54]

76.     In addition to operating their online and mobile platforms, the Alibaba Defendants play a critical role in connecting online merchants and consumers across the globe and "making it possible for them to do business anytime and anywhere."[55]  The Alibaba Defendants provide the necessary web-based and mobile infrastructure to support their platforms and merchants' businesses, as well as marketing services to support their merchants' businesses through their proprietary online marketing platform, Alimama.  The Alibaba Defendants also provide a logistics platform and information system to help facilitate the reliable delivery of their online merchants' products to consumers.[56]  In addition, the Alibaba Defendants provide loan financing to their merchants' businesses through their micro-finance program.[57]

---

[53]   F-1 at 1, 132.

[54]   F-1 at 1; Peater Eavis, "Big Profits at Alibaba, but Filing has Gaps," NY Times (May 6, 2014).

[55]   *Id.*

[56]   F-1 at 2, 7.

[57]   F-1 at 38.

77.     The Alibaba Group's related company, Alipay, provides payment and escrow services to merchants and consumers across the Alibaba Defendants' online and mobile platforms.

78.     Alipay provides "substantially all of the payment processing and escrow services" for buyers and sellers on Alibaba's platforms.[58]

79.     Alimama is Alibaba's proprietary online marketing platform.[59]  For example and without limitation, Alimama offers pay-for-performance ("P4P") services "where sellers bid for keywords that match product or service listings appearing in search or browser results on a cost-per-click ("CPC") basis."[60]   Alimama also offers display marking, where online merchants bid for display positions on Alibaba's marketplaces "at fixed prices or prices established by a real-time bidding system on a cost-per-thousand impression" ("CPM") basis.[61]  Alimama utilizes "cloud-based deep learning extensively to enhance the consumer targeting efficiency" of the Alibaba Defendants' marketing services.[62]

**IV.     The Sale of Counterfeit Products Through the Alibaba Marketplaces**

80.     Mass quantities of Counterfeit Products are offered for sale on the Alibaba Marketplaces.

81.     Alibaba Group offers the following self-serving language in its Form F-1: "Although we have adopted measures to verify the authenticity of products sold on our marketplaces and minimize potential infringement of third-party intellectual property rights

---

[58]  F-1 at 25.

[59]  F-1 at 148.

[60]  F-1 at 89.

[61]  F-1 at 89.

[62]  F-1 at 182.

through our intellectual property infringement complaint and take-down procedures, these measures may not always be successful.  We may be subject to allegations of civil or criminal liability for unlawful activities carried out by third parties through our online marketplaces. When we receive complaints or allegations regarding infringement or counterfeit goods, we follow certain procedures to verify the nature of the complaint and the relevant facts.  We believe these procedures are important to ensure confidence in our marketplace among buyers and sellers; however, these procedures could result in delays in delistings of allegedly infringing product listings.  In the event that alleged counterfeit or infringing products are listed or sold on our marketplaces or our other services, we could face claims for such listings, sales or alleged infringement or for our failure to act in a timely or effective manner to restrict or limit such sales or infringement.  We may implement further measures in an effort to protect against these potential liabilities that could require us to spend substantial additional resources and/or experience reduced revenues by discontinuing certain service offerings.  In addition, these changes may reduce the attractiveness of our marketplaces and other services to buyers, sellers or other users."[63]

82.     The Alibaba Defendants are well aware that:  (1) Counterfeit Products are being sold through the Alibaba Marketplaces; (2) their take down procedures are untimely and ineffective; and (3) more effective procedures would lead to the Alibaba Defendants' marketplaces being less attractive to the sellers and buyers of Counterfeit Products, hurting the Alibaba Defendants' bottom line.

---

[63]   F-1 at 33.

A.     **Alibaba.com**

83.     Alibaba.com, "an English-language marketplace for global trade,"[64] knowingly provides a marketplace for wholesale sellers of Counterfeit Products and materials used in manufacturing or packaging Counterfeit Products.

84.     The Alibaba Defendants verify that certain merchants on Alibaba.com are "Gold Suppliers."  In order to become a "Gold Supplier," a merchant must pass the Alibaba Defendants' onsite check and pay a membership fee.  Once a merchant becomes a "Gold Supplier," it receives authorization to display the "Gold Supplier" icon in the Alibaba Marketplace so that Alibaba.com can vouch for the merchant's alleged authenticity and communicate to consumers that it has investigated the merchant and confirmed that goods sold by the merchant are lawful and legitimate.  According to the Alibaba Group Form F-1, "[r]evenue from our global wholesale marketplace is primarily generated from the sale of our "Gold Supplier" memberships on Alibaba.com, which allow wholesalers to host premium storefronts, with product listings on the marketplace, as well as value added services, such as product showcase, custom clearance, value-added tax, or VAT, refund and other import/export business solutions."[65]

85.     Certain merchants on Alibaba.com are listed as "Assessed Suppliers."  "Assessed Suppliers" are "Gold Suppliers" that have been inspected onsite by a third-party inspection company.  "Assessed Suppliers" offer information obtained from their factory audits, assessment reports, verified videos, and verified main products.  Alibaba.com uses the designation

---

[64]   F-1 at 74.

[65]   F-1 at 90.

"Assessed Suppliers" to communicate to consumers that it has investigated such merchants and to confirm that goods sold by "Assessed Suppliers" are lawful and legitimate.

86.     Despite their "Gold Supplier" and "Assessed Supplier" labels, "Gold Supplier" merchants and/or "Assessed Supplier" merchants on Alibaba.com are selling Counterfeit Products and/or offering materials for use in the manufacture or packaging of Counterfeit Products.

87.     As of June 4-6, 2014, there were at least 290 sellers offering counterfeit Gucci products on Alibaba.com.

88.     For example, shown below is an image of an authentic Gucci "original GG canvas diaper bag tote," which retails for $795.  The product displayed below bears Gucci's federally registered trademark name, repeating "GG" design, and green-red-green stripe.  *See* Ex. 1 (U.S. Reg. Nos. 878,292; 4,229,081; 1,122,780).



89.     In comparison, set forth below is an image of a Counterfeit Product that was offered for sale to the public through Alibaba.com by Hangzhou Yanbei Trading Co., Ltd. ("Hangzhou Yanbei"), a merchant listed on Alibaba.com as both a "Gold Supplier" and an "Assessed Supplier" until this Merchant Defendant was enjoined, and who listed North America as one of the main markets in which it sold its goods.  The price of the bag was $2–$5 per unit,

and the seller offered a minimum of 2,000 units and up to 50,000 units.  The merchant noted that the bag was "High Quality Leather, PU, cloth etc." and "other materials per client's request" and that "Buyer's logos/size/color are accepted, buyer's design is welcome."  Although it was obvious that Hangzhou Yanbei was selling wholesale quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the handles and ornamentation on the authentic Gucci handbag shown above and bears an exact copy of Gucci's federally registered trademark name, repeating "GG" design, and green-red-green stripe.  The Counterfeit Product was intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



90.     As a result of having inspected Hangzhou Yanbei's business and the fact that the merchant sold mass quantities of "Gucci" bags using "materials as per client's request" for which "buyer's design is welcome" for $2–$5 per piece with a 2,000 piece minimum, the Alibaba Defendants knew and should have known that this merchant was selling Counterfeit Products on Alibaba.com.  The Alibaba Defendants nevertheless continued to list Hangzhou Yanbei as a Gold supplier and an Assessed supplier.  The Alibaba Defendants continued to supply this

Merchant Defendant with the marketplace, advertising, and other crucial support for the sale of the Counterfeit Products in violation of the Lanham Act.

91.     Further, shown below is an authentic Gucci "soho large red leather cosmetic bag," which retails for $380.  The product displayed below bears Gucci's federally registered trademark interlocking non-facing "GG" design.  *See* Ex. 1 (U.S. Reg. No. 3,039,630).



92.     In comparison, set forth below is an image of a Counterfeit Product offered for sale to the public—until this Merchant Defendant was enjoined—through Alibaba.com by Yiwu Bothwiner Fashion Accessory Co., Ltd. ("Yiwu Bothwiner"), a merchant listed on Alibaba.com as both a "Gold Supplier" and an "Assessed Supplier."  The price of the cosmetic bag was $3.50–$11.00 per unit, and the seller offered a minimum of 500 units and up to 10,000 units per month.  The cosmetic bag was made of "PU," or synthetic leather.  The merchant noted that its main market was North America and that the brand name was "[c]ustomized."  Although it is obvious that Yiwu Bothwiner was selling wholesale quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the zipper and the ornamentation on the authentic Gucci cosmetic bag shown above and bears an exact copy of Gucci's federally registered trademark interlocking non-facing "GG" design.  The Counterfeit Product was intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



93.     As a result of having inspected Yiwu Bothwiner's business and the fact that the

merchant sold mass quantities of synthetic leather "Gucci" (or "customized" brand) cosmetic

bags for $3.50–$11.00 per piece with a capacity of 10,000 pieces per month, the Alibaba

Defendants knew and should have known that this merchant was selling Counterfeit Products on

Alibaba.com.  The Alibaba Defendants nevertheless continued to list Yiwu Bothwiner as a Gold

Supplier and an Assessed Supplier.  The Alibaba Defendants continued to supply this Merchant

Defendant with the marketplace, advertising, and other crucial support for the sale of the

Counterfeit Products in violation of the Lanham Act.

94.     Further, shown below is an authentic Gucci "Leather Zip Around Wallet," which

retails for $495.  The product displayed below bears Gucci's federally registered trademark

repeating "GG" design.  *See* Ex. 1 (U.S. Reg. No. 4,229,081).



95.     In comparison, set forth below is an image of a Counterfeit Product offered for

sale to the public through Alibaba.com by Defendant Guangzhou Yongxing Leather Goods Mfg

("Guangzhou Yongxing"), a merchant listed on Alibaba.com as both a "Gold Supplier" and an "Assessed Supplier."  Guangzhou Yongxing was offering a minimum of 300 units and up to 50,000 units per month until this Merchant Defendant was enjoined.  In addition, the merchant noted that its main market was North America.  Although it is obvious that Guangzhou Yongxing was selling wholesale quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the zipper and ornamentation on the authentic Gucci wallet shown above and bears an exact copy of Gucci's federally registered trademark repeating "GG" design.  The Counterfeit Product was intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



96.     As a result of having inspected Guangzhou Yongxing's business and the fact that the merchant is offering to supply up to 50,000 units of "Gucci" wallets per month sourced by "Direct Chinese factory," the Alibaba Defendants knew and should have known that this merchant was selling Counterfeit Products on Alibaba.com.  The Alibaba Defendants nevertheless continued to list Guangzhou Yongxing as a Gold Supplier and an Assessed Supplier.  The Alibaba Defendants continued to supply this Merchant Defendant with the

marketplace, advertising, and other crucial support for the sale of the Counterfeit Products in violation of the Lanham Act until this Merchant Defendant was enjoined.

97.     In addition, the Alibaba Defendants know merchants listed as both "Gold Suppliers" and "Assessed Suppliers" on Alibaba.com are offering for sale materials advertised for use in making Counterfeit Products and the Alibaba Defendants have sold Plaintiffs' Marks as keywords to such Merchant Defendants.

98.     For example, a search for "Gucci" on the Alibaba.com website generated a list of results, which included Defendant Dongguan Huawang Leather Co., Ltd. ("Dongguan Huawang"), a merchant recognized as both a "Gold Supplier" and an "Assessed Supplier" on Alibaba.com.  Dongguan Huawang, who listed North America as one of the main markets in which it sells its goods until this Merchant Defendant was enjoined—listed 46 items advertised as "leather for Gucci bags, belts and shoes."  Set forth below are images of Dongguan Huawang's listings on Alibaba.com on or about May 22, 2014, advertising "top quality beautiful ostrich pu leather for gucci bags," "high quality & fashion pu leather for gucci bags," and "fashion pu shoe lining material for gucci."





99.     As a result of the Alibaba Defendants' inspection of Dongguan Huawang's business and the fact that Dongguan Huawang was offering 46 different types of "artificial leather" or other fabric "for gucci bags," the Alibaba Defendants knew and should have known that this merchant was offering materials used to make Counterfeit Products.  The Alibaba Defendants nevertheless continued to list Dongguan Huawang as a Gold Supplier and Assessed Supplier.  The Alibaba Defendants continued to supply this Merchant Defendant with the marketplace, advertising, and other crucial support for the sale of the Counterfeit Products in violation of the Lanham Act.

100.    The Alibaba Defendants use keyword searches and other marketing strategies to direct consumers to the Counterfeit Products, as well as to the materials and packaging used in connection with the manufacture and sale of the Counterfeit Products.

101.    For example, the Alibaba Defendants and/or their systems and algorithms were intentionally designed to cause consumers to be offered Counterfeit Products when they search for brand names (including Plaintiffs' trademark names) using the search functionality of the Alibaba Defendants' websites.  For example, when the term "Gucci" is used in a search on Alibaba.com, the website displayed seller listings that offer predominantly Counterfeit Products. It is clear that the Alibaba Defendants intended these results because they inserted the keyword "Gucci" into the metadata on the HTML code of web pages generated by such searches alongside the additional keywords "synthetic leather."

102.    When the term "replica," a known euphemism for "counterfeit," was used as a search term, the word "wristwatches" was added by the Alibaba Defendants to the metadata for that search.  This caused sellers of counterfeit watches bearing the Plaintiffs' Marks to be displayed in the search results.

103.    When the term "knockoff," another common description for counterfeit or infringing goods, was used as a search term, the word "handbags" was added by the Alibaba Defendants to the metadata.

104.    These extra keywords and phrases are added using an internal database that recognizes the keyword searched and places it deliberately into a category predetermined by the Alibaba Defendants.  Each time a search results page is generated, a new page is created that is subject to being crawled and preserved by Google and other external search engines.  Every search results page that Alibaba.com generates provides another opportunity for the search to be

preserved by Google and other external search engines and ultimately found by a consumer, as the metadata on a webpage is a component of the algorithms used by search engines to locate relevant pages for consumers.

105.    The insertion of additional keywords by the Alibaba Defendants represents an intentional attempt to direct consumers to particular categories of, *inter alia*, Counterfeit Products.

106.    By way of example, as noted above, merchants on Alibaba.com sold "artificial leather" advertised for use in manufacturing "Gucci" handbags and the search for "Gucci" over Alibaba.com thus resulted in hits for such merchants.  The Alibaba Defendants deliberately added the keyword phrase "artificial leather" to searches for "Gucci" to assist Merchant Defendants in finding customers for the artificial leather they sold for use in making counterfeit "Gucci" bags.

107.    By way of further example, as noted above, when a user types the term "replica," into the search bar on Alibaba.com, Alibaba.com adds the term "wristwatch," resulting in numerous hits for "replica" watches.  These merchants of "replica" wristwatches included merchants selling blatantly counterfeit "Gucci" wristwatches.

108.    One such listing, displayed on or about June 6, 2014, was entitled "Japan movt quartz watch wholesale replica watches."  The seller was an Alibaba.com "Gold Supplier" and "Assessed Supplier" merchant, Defendant Shen Zhen Aiers Watch Co., Ltd. ("Shen Zhen Aiers"), who offered for sale "Gucci" wristwatches including the wristwatch shown below, bearing an exact copy of Gucci's federally registered trademark interlocking non-facing "GG" design until this Merchant Defendant was enjoined.  The wristwatch depicted below was offered

by Shen Zhen Aiers at $0-100 per piece for a minimum of 500 pieces per order, and the seller

offered to supply up to 30,000 pieces per month.



109.    The authentic Gucci watch, depicted below, retails for $990.  The product

displayed below bears Gucci's federally registered trademark GUCCI name and interlocking

non-facing "GG" design.  *See* Ex. 1 (U.S. Reg. Nos. 959,338; 3,470,140).  Although it is obvious

that Shen Zhen Aiers was selling wholesale quantities of Counterfeit Products from its electronic

store, the Counterfeit Product mimics the design of the authentic Gucci wristwatch shown below

and bears an exact copy of Gucci's federally registered interlocking non-facing "GG" design.

The Counterfeit Product was intended to confuse both the ultimate retail consumer and persons

observing the ultimate consumer into believing that it is a genuine Gucci product.



110.    As a result of the Alibaba Defendants' inspection of Shen Zhen Aiers' business,

and the fact that Shen Zhen Aiers used the term "replica" to advertise its wristwatches and

offered tens of thousands of "Gucci" watches for less than $100 per piece, the Alibaba Defendants knew and should have known that this merchant was selling counterfeit wristwatches using the Gucci Marks. Despite this knowledge, the Alibaba Defendants continued to list Shen Zhen Aiers as a Gold Supplier and an Assessed Supplier. The Alibaba Defendants continued to provide the marketplace, advertising, and other essential services to this Merchant Defendant, including the payment processing services that allowed Shen Zhen Aiers to continue to sell its counterfeit "Gucci" watches.

111.     In addition, the Alibaba Defendants, on information and belief, sold the keyword "replica" to Shen Zhen Aiers and added the term "wristwatches" to searches for "replica" to direct Internet browsers to merchants selling replica wristwatches, including counterfeit wristwatches bearing the Gucci Marks.

112.     Another replica wristwatch merchant, Merchant Defendant Shenzhen Meigeer Watch Co., Ltd. ("Shenzhen Meigeer"), also a "Gold Supplier" and "Assessed Supplier," offered the following counterfeit wristwatch bearing an exact copy of Gucci's federally registered trademark interlocking non-facing "GG" design and green-red-green stripe, at $10–$80 per piece with a minimum of 300 pieces per order and 200,000 pieces per month, until this Merchant Defendant was enjoined.



113.    The authentic "u-play collection" Gucci watch, depicted below, retails for $960. The product displayed below bears Gucci's federally registered trademark GUCCI name, interlocking non-facing "GG" design, and green-red-green stripe.  *See* Ex. 1 (U.S. Reg. Nos. 959,338; 3,470,140; 1,123,224).   Although it is obvious that Shenzhen Meigeer was selling wholesale quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the authentic Gucci wristwatch shown below and bears an exact copy of Gucci's federally registered trademark interlocking non-facing "GG" design and green-red-green stripe.  The Counterfeit Product was intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



114.    Moreover, in response to a query from an Internet user asking about a "replica Gucci watch" Shenzhen Meigeer responded:  "Are you looking for the Gucci replica watch, right.  It happen that our factory have such models as attached picture.  Please check that if you like them or not."  Shenzhen Meigeer attached images of digital watches bearing the Gucci Marks, including the picture below, and sold Plaintiffs' investigator a sample of the watch depicted below for $130 plus transfer fees on or about June 26, 2014, for shipment to New York. The seller noted that "mass order price will be $63.5 usd."  Shenzhen Meigeer also operated a

website, www.breplica.com, in which it boasted that "**HK Bealan International Industrial Co., Ltd**, established in January 2007, specializing in developing and manufacturing the brand of Rolex, Cartier, LV, Panerai, Omega, Gucci, Bvlgari, Breitling, Tag Heuer, Patek Philippe, Rado, Mont Blanc, A.Lange & Sohne, Piaget, Vacheron Constantin, Franck Muller and so on. To the styles of each brand, we can make 98% of them, and all watches are with refined quality and wholesale price."



115.    The authentic "I-gucci collection watch," depicted below, retails for $1,495.



116.    On or about June 26, 2014, Plaintiffs' investigator purchased a sample of the counterfeit watch from Shenzhen Meigeer for shipment to the United States.

117.    As a result of the Alibaba Defendants' inspection of Shenzhen Meigeer's business and the fact that Shenzhen Meigeer used the term "replica" to advertise its wristwatches and offered mass quantities of "Gucci" watches for less than $100 per piece, the Alibaba Defendants knew and should have known that Shenzhen Meigeer was selling counterfeit wristwatches bearing the Gucci Marks.  Despite this knowledge, the Alibaba Defendants continued to list Shenzhen Meigeer as a Gold Supplier and an Assessed Supplier.  The Alibaba Defendants continued to provide the marketplace, advertising, and other essential services to this Merchant Defendant, including the payment processing services that allowed Shenzhen Meigeer to continue to sell its counterfeit "Gucci" watches.

118.     In addition, the Alibaba Defendants, on information and belief, sold the keyword "replica" to Shenzhen Meigeer, and added the term "wristwatches" to searches for "replica" to direct Internet browsers to merchants selling replica wristwatches, including counterfeit wristwatches bearing the Gucci Marks.

119.    Merchant Defendant Shenzhen Babylon Watch Co., Ltd. ("Shenzhen Babylon") was another replica wristwatch merchant that appeared in the search results when a browser searched "replica" on Alibaba.com until this Merchant Defendant was enjoined.  Shenzhen Babylon, a "Gold Supplier" with an "onsite check," offered counterfeit "Luxury waterproof high quality replica watches," including the watch depicted below, which bears an exact copy of Gucci's federally registered repeating "GG" design trademark.  Shenzhen Babylon was offering the counterfeit Gucci watch displayed below for $15–$28 per piece, with a minimum of 500 pieces per order and up to 20,000 pieces per month.



120.    The authentic Gucci watch, depicted below, retails for $895.  The product displayed below bears Gucci's federally registered trademark GUCCI name and repeating "GG" design.  *See* Ex. 1 (U.S. Reg. Nos. 959,338; 4,229,081).



121.    As a result of the Alibaba Defendants' inspection of Shenzhen Babylon's business and the fact that Shenzhen Babylon used the term "replica" to advertise its wristwatches and offered mass quantities of "Gucci" watches for less than $100 per piece, the Alibaba Defendants knew and should have known that Shenzhen Babylon was selling counterfeit wristwatches bearing the Gucci Marks.  Despite this knowledge, the Alibaba Defendants continued to list Shenzhen Babylon as a Gold Supplier.  The Alibaba Defendants continued to provide the marketplace, advertising, and other essential services to this Merchant Defendant, including the

payment processing services that allowed Shenzhen Babylon to continue to sell its counterfeit "Gucci" watches.

122.   In addition, the Alibaba Defendants, on information and belief, sold the keyword "replica" to Shenzhen Babylon, and added the term "wristwatches" to searches for "replica" to direct Internet browsers to merchants selling replica wristwatches, including counterfeit wristwatches bearing the Gucci Marks.

123.   These "replica" merchants are representative of numerous similar merchants offering for sale wristwatches bearing Plaintiffs' Marks on Alibaba.com with the Alibaba Defendants' actual knowledge.

124.   In addition to steering consumers to sellers of Counterfeit Products and materials used to manufacture such products through the use of searches incorporating keywords chosen for their specific associations with such counterfeit goods on Alibaba.com, the representatives of the Alibaba Defendants also directly engage with prospective purchasers to assist them in connecting with the merchants selling Counterfeit Products on Alibaba.com.

125.   When a prospective purchaser makes a request to a merchant on Alibaba.com, the request form contains a box to check if the purchaser wants to be notified of other sellers of the same product.  This box is a tool used by the Alibaba Defendants to match prospective purchasers of Counterfeit Products with sellers offering such Counterfeit Products.  By way of example, when one Internet user located in New York reached out to a merchant selling branded packaging, minimum 1000 per order, on Alibaba.com, leaving the notification box checked, the same Internet user was later contacted by a representative of the Alibaba Defendants, an "AlisourcePro Rep," offering to pair him with other merchants selling mass quantities of similar branded packaging.  On information and belief, Alibaba's "AlisourceProReps" regularly assist in

pairing buyers with sellers of Counterfeit Products, and materials used to manufacture or sell the Counterfeit Products.

126.    Moreover, Alibaba.com also actively suggests merchants to its customers based on keywords the customers have previously searched, including suggesting merchants selling Counterfeit Products.

127.    For example and without limitation, the Alibaba Defendants suggested that Plaintiffs' investigator might be interested, based on prior keyword searches on Alibaba.com, in the Alibaba.com merchant selling the watch depicted below (bearing Gucci's federally registered trademark interlocking non-facing "GG" design) at $2.33–$5.21 per piece, for a minimum order of 500 pieces and up to *8,000,000* per month.



**B.       Taobao.com**

128.    Online merchants are required to verify their identity before listing their products and services on individual storefronts within the Taobao Marketplace.[66]  A business that intends to open a storefront in the Taobao Marketplace must provide corporate documents and an individual must provide a photograph showing his or her face and an ID card to open a storefront in the Taobao Marketplace.

---

[66]   F-1 at 153.

129.    Notwithstanding the Alibaba Defendants' asserted controls and verification of sellers' identities, the sale of counterfeit goods bearing Plaintiffs' Marks is rampant in the Taobao Marketplace.

130.    As of June 4-6, 2014, there were at least 697 sellers of "Gucci" products on Taobao.com whose listings openly acknowledged that the products were counterfeit, offering for sale more than 1,400 Counterfeit Products using the Gucci Marks without authorization.

131.    As of June 4-6, 2014, there were at least 707 sellers of "Bottega Veneta" products on Taobao.com whose listings openly acknowledged that the products were counterfeit, offering for sale more than 4,600 Counterfeit Products using the Bottega Veneta Marks without authorization.

132.    According to one report, on April 22, 2013, more than 2,000 shops on Taobao.com were identified as selling fake Gucci bags.  During the thirty-day period between March 22, 2013 and April 22, 2013, more than 37,000 fake Gucci bags were sold in the Taobao Marketplace by at least 1300 shops in the Taobao Marketplace.

133.    According to the same report, on April 22, 2013, there were 2,000 shops on Taobao.com identified as selling fake Gucci shoes.  During the thirty-day period between March 22, 2013 and April 22, 2013, more than 26,000 fake Gucci pairs of shoes were sold on Taobao.com by at least 1400 shops in the Taobao Marketplace.

134.    During the period between May 16, 2014 and June 16, 2014, more than 37,000 counterfeit Gucci bags were sold on Taobao.com.   2,731 different vendors offering counterfeit Gucci bags were identified in the Taobao Marketplace during the same period.

135.    During the period between May 16, 2014 and June 16, 2014, more than 7,000 pairs of counterfeit Gucci shoes were sold on Taobao.com.  1,342 different vendors offering counterfeit Gucci shoes were identified in the Taobao Marketplace during the same period.

136.    Plaintiffs have notified the Alibaba Defendants on numerous occasions through Taobao.com's notice and takedown procedures of the presence of merchants selling Counterfeit Products on the website.

137.    On average, it took Taobao Marketplace 10-15 days to remove an infringing listing, if it did so at all.  Typically, if Taobao Marketplace did remove the infringing seller's listing, the same seller would soon reappear on the Taobao Marketplace offering Counterfeit Products for sale.

138.    Since February 2014, representatives of Gucci filed notices concerning at least nine different merchants selling Counterfeit Products on Taobao.com who continued to sell such products weeks or months following Gucci's filing of the notices.  Since March 2014, Bottega Veneta filed notices concerning at least eight different merchants selling counterfeit Bottega Veneta bags who continued to sell such products weeks or months following Bottega Veneta's filing of the notices.

139.    For example and without limitation, Merchant Defendant VANCS Where Boutique was offering for sale Counterfeit Products, namely footwear, bearing the Gucci Marks. On or around May 21, 2014, Plaintiffs' representatives—after inspecting VANCS Where Boutique's products and verifying that the merchant was selling Counterfeit Products— notified the Taobao Marketplace that VANCS Where Boutique was offering Counterfeit Products for sale through Taobao.com.  Taobao Marketplace claimed that it could not confirm the infringement because the seller's link was no longer active.  Nonetheless, VANCS Where Boutique continued

to market its Counterfeit Products through Taobao.com.  On June 2, 2014, Plaintiffs' investigator purchased counterfeit shoes from VANCS Where Boutique through Taobao.com for shipment to New York.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction was processed through Alipay.  The counterfeit shoes, depicted below, bear Gucci's federally registered repeating "GG" design trademark, *see* Ex. 1 (U.S. Reg. No. 4,229,081), and were being offered for sale by VANCS Where Boutique for 268 RMB, which is approximately $40 a pair, until this Merchant Defendant was enjoined.  In addition, on or about June 18, 2014, Plaintiffs' representatives inspected products received from VANCS Where Boutique and verified that the merchant was selling counterfeit shoes bearing the Gucci Marks.



140.    The Alibaba Defendants knew and should have known that VANCS Where Boutique was selling Counterfeit Products not only because of repeated sales at patently unrealistic prices (approximately $40 for a pair of shoes that retails for close to $500), but for the very simple reason that Gucci told them that the products VANCS Where Boutique was selling were counterfeit.  The Alibaba Defendants enabled this known seller of counterfeits to effectuate sales of Counterfeit Products by providing the marketplace, advertising, and other services to this Merchant Defendant, including payment processing services.

141.    VANCS Where Boutique is by no means the only known counterfeiter about whom the Taobao Marketplace was expressly notified by Plaintiffs—through Taobao.com's

notice and takedown procedures—yet whom the Alibaba Defendants continued to assist in selling Counterfeit Products through Taobao.com.

142.    Merchant Defendant Spring Rain Leather Goods was also selling Counterfeit Products to Internet users through Taobao.com.  On April 18, 2014, Plaintiffs' representatives—after inspecting Spring Rain Leather Goods' products and verifying that the merchant was selling Counterfeit Products—notified the Taobao Marketplace that Spring Rain Leather Goods was offering Counterfeit Products for sale through Taobao.com.  Nonetheless, Spring Rain Leather Goods continued to market Counterfeit Products through Taobao.com.  On June 2, 2014, approximately one month after Plaintiffs' representatives notified Taobao Marketplace that Spring Rain Leather Goods' online storefront was offering Counterfeit Products, Spring Rain Leather Goods sold a counterfeit bag to Plaintiffs' investigator through Taobao.com for shipment to New York.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction was processed through Alipay.  The bag, depicted below, bears Gucci's federally registered repeating "GG" design trademark, *see* Ex. 1 (U.S. Reg. No. 4,229,081), and was offered for sale by Spring Rain Leather Goods for 130 RMB, which is approximately $21.  On or about June 19, 2014, Plaintiffs' representatives inspected products received from Spring Rain Leather Goods and verified that the merchant was selling counterfeit bags bearing the Gucci Marks.  The Alibaba Defendants enabled this known seller of counterfeits to effectuate sales of its Counterfeit Products by providing the marketplace, advertising, and other crucial services to this Merchant Defendant, including payment processing services.



143.    Merchant Defendant Celebrity Shoe was also selling Counterfeit Products to Internet users through Taobao.com, and on April 25, 2014, Plaintiffs' representatives—after inspecting Celebrity Shoe's products and verifying that the merchant was selling Counterfeit Products—notified the Taobao Marketplace of that fact.  Nonetheless, Celebrity Shoe continued to market Counterfeit Products through Taobao.com.  On June 2, 2014, approximately one month after Plaintiffs' representatives notified Taobao Marketplace that Celebrity Shoe's online storefront was offering Counterfeit Products, Celebrity Shoe sold counterfeit shoes to Plaintiffs' investigator through Taobao.com for shipment to New York.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction was processed through Alipay.  The shoes, depicted below, bear Gucci's federally registered repeating "GG" design and green-red-green stripe marks, *see* Ex. 1 (U.S. Reg. Nos. 1,483,526; 4,229,081), and were offered for sale by Celebrity Shoe for 300 RMB, which is approximately $48, a pair, until this Merchant Defendant was enjoined.  On or about June 17, 2014, Plaintiffs' representatives inspected products received from Celebrity Shoe and verified that the merchant was selling counterfeit shoes bearing the Gucci Marks.  The Alibaba Defendants enabled this known seller of counterfeits to effectuate sales of its Counterfeit Products by providing the marketplace, advertising, and other crucial services to this Merchant Defendant, including payment processing services.



144.    Merchant Defendant Jinlong Luxury City was also selling Counterfeit Products to Internet users through Taobao.com, and on May 21, 2014, Plaintiffs' representatives—after inspecting Jinlong Luxury City's products and verifying that the merchant was selling Counterfeit Products—notified the Taobao Marketplace of that fact.  Nonetheless, Jinlong Luxury City continued to market Counterfeit Products through Taobao.com.  On June 2, 2014, Jinlong Luxury City sold counterfeit shoes to Plaintiffs' investigator through Taobao.com for shipment to New York.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction was processed through Alipay.  The shoes, depicted below, bear Gucci's federally registered repeating "GG" design and green-red-green stripe marks, *see* Ex. 1 (U.S. Reg. Nos. 1,483,526; 4,229,081), and were offered for sale by Jinlong Luxury City for 350 RMB, which is approximately $56, per pair, until this Merchant Defendant was enjoined.  On or about June 17, 2014, Plaintiffs' representatives inspected products received from Jinlong Luxury City and verified that the merchant was selling counterfeit shoes bearing the Gucci Marks.  The Alibaba Defendants enabled this known seller of counterfeits to effectuate sales of its Counterfeit Products by providing the marketplace, advertising, and other crucial services to this Merchant Defendant, including payment processing services.



145.    Merchant Defendant Gucci Fashion Shop was also selling Counterfeit Products to

Internet users through Taobao.com, and on May 7, 2014, Plaintiffs' representatives—after

inspecting Gucci Fashion Shop's products and verifying that the merchant was selling

Counterfeit Products—notified the Taobao Marketplace of that fact.  Nonetheless, Gucci Fashion

Shop continued to market Counterfeit Products through Taobao.com.  On June 2, 2014,

approximately one month after Plaintiffs' representatives notified Taobao Marketplace that

Gucci Fashion Shop's online Storefront was offering Counterfeit Products, Gucci Fashion Shop

sold a pair of counterfeit shoes to Plaintiffs' investigator through Taobao.com for shipment to

New York.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction

was processed through Alipay.  The shoes, depicted below, bear Gucci's federally registered

repeating "GG" design and green-red-green stripe marks, *see* Ex. 1 (U.S. Reg. Nos. 1,483,526;

4,229,081), and were offered for sale by Gucci Fashion Shop for 328 RMB, which is

approximately $53, per pair, until this Merchant Defendant was enjoined.  On or about June 18,

2014, Plaintiffs' representatives inspected products received from Gucci Fashion Shop and

verified that the merchant was selling counterfeit shoes bearing the Gucci Marks.  The Alibaba

Defendants enabled this known seller of counterfeits to effectuate sales of its Counterfeit

Products by providing the marketplace, advertising, and other crucial services to this Merchant

Defendant, including payment processing services.



146.    Merchant Defendant Huiming Leather Mall was also selling Counterfeit Products

to Internet users through Taobao.com, and on April 16, 2014, Plaintiffs' representatives—after

inspecting Huiming Leather Mall's products and verifying that the merchant was selling

Counterfeit Products—notified the Taobao Marketplace of that fact.  Nonetheless, Huiming

Leather Mall continued to market Counterfeit Products on Taobao.com.  On June 19, 2014, less

than two months after Plaintiffs' representatives notified Taobao Marketplace that Huiming

Leather Mall's online storefront was offering Counterfeit Products, Huiming Leather Mall sold a

counterfeit "Gucci" bag to Plaintiffs' investigator through Taobao.com for shipment to New

York.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction was

processed through Alipay.  The Counterfeit Product was received on or about June 27, 2014.

The bag, depicted below, bears Gucci's federally registered interlocking non-facing "GG" design

trademark, *see* Ex. 1 (U.S. Reg. No. 3,039,630), and was offered for sale by Huiming Leather

Mall for 1300 RMB, which is approximately $209, until this Merchant Defendant was enjoined.

Plaintiffs' representatives inspected the below item sold by Huiming Leather Mall and have

determined that the bag is counterfeit.



147.    Merchant Defendant Hong Kong Longitude and Latitude International Trading was also selling Counterfeit Products to Internet users through Taobao.com, and on February 24, 2014, Plaintiffs' representatives—after inspecting Hong Kong Longitude and Latitude International Trading's products and verifying that the merchant was selling Counterfeit Products—notified Taobao Marketplace of that fact.  Nonetheless, Hong Kong Longitude and Latitude International Trading continued to market Counterfeit Products on Taobao.com.  On June 19, 2014, less than four months after Plaintiffs' representatives notified the Taobao Marketplace that Hong Kong Longitude and Latitude International Trading's online storefront was offering Counterfeit Products, Hong Kong Longitude and Latitude International Trading sold a counterfeit "Gucci" bag to Plaintiffs' investigator through Taobao.com for shipment to New York.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction was processed through Alipay.  The counterfeit bag was delivered to New York.  The bag, depicted below, bears Gucci's federally registered repeating "GG" design trademark, *see* Ex. 1 (U.S. Reg. No. 4,229,081), and was offered for sale by Hong Kong Longitude and Latitude International Trading for 1255 RMB, which is approximately $202, until this Merchant Defendant was enjoined.  On or about June 17, 2014, Plaintiffs' representatives inspected products received from Hong Kong Longitude and Latitude International Trading and verified

that the merchant was selling counterfeit bags bearing the Gucci Marks.  The Alibaba Defendants enabled this known seller of counterfeits to effectuate sales of its Counterfeit Products by providing the marketplace, advertising, and other crucial services to this Merchant Defendant, including payment processing services.



148.    Merchant Defendant Coco Fashion Style was also selling Counterfeit Products to Internet users through Taobao.com.  On April 25, 2014, Plaintiffs' representatives—after inspecting Coco Fashion Style's products and verifying that the merchant was selling Counterfeit Products—notified the Taobao Marketplace that Coco Fashion Style was offering counterfeit Bottega Veneta bags and wallets to Internet users through Taobao.com.  Nevertheless, Coco Fashion Style continued to market Counterfeit Products on Taobao.com.  On June 19, 2014, less than two months after Plaintiffs' representatives notified Taobao Marketplace that Coco Fashion Style's online storefront was offering Counterfeit Products, Coco Fashion Style sold a counterfeit Bottega Veneta wallet to Plaintiffs' investigator through Taobao.com for shipment to New York.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction was processed through Alipay.  The counterfeit wallet, depicted below, bears Bottega Veneta's federally registered intrecciato design trademark, *see* Ex. 3 (U.S. Reg. No. 4,527,371), and was purchased after Taobao Marketplace was put on notice that Coco Fashion Style was selling Counterfeit Goods.  The product displayed below was offered for sale by Coco Fashion Style for

258 RMB, which is approximately $42, until this Merchant Defendant was enjoined.  Plaintiffs'

representatives inspected products received from Coco Fashion Style and verified that the

merchant was selling counterfeit bags and wallets bearing the Bottega Veneta Marks, including

Bottega Veneta's registered trademark name.  The Alibaba Defendants enabled this known seller

of counterfeits to effectuate sales of its Counterfeit Products by providing the marketplace,

advertising, and other crucial services to this Merchant Defendant, including payment processing

services.



149.    The Alibaba Defendants assisted these known sellers of counterfeits in continuing

to sell their Counterfeit Products by providing the marketplace, advertising, and other critical

services to the Merchant Defendants, including payment processing services, after receiving

express notification from Plaintiffs that the sellers were offering Counterfeit Products.

150.    The Alibaba Defendants continued to provide these Merchant Defendants with the

marketplace to sell the Counterfeit Products after receiving express notification from Plaintiffs

that the merchants were selling Counterfeit Products.  The Alibaba Defendants provided

additional substantial assistance to the Merchant Defendants selling the Counterfeit Products

described above, including, without limitation, online marketing, payment processing, and

shipping services.

151.    At the time that the Counterfeit Products described above were offered for sale to the consuming public, the Alibaba Defendants had specific knowledge that such products were counterfeit because they had already been informed by Plaintiffs that the specific Merchant Defendants were selling Counterfeit Products.

152.    Taobao Marketplace has provided a marketplace for the Merchant Defendants to sell additional Counterfeit Products into this District, with actual knowledge that the Merchant Defendants were offering Counterfeit Products.  Below are examples of products recently purchased from sellers on Taobao.com for shipment to New York.  Although it is clear from the listings that the products are counterfeit based on the patently unrealistic price points and other indicia, each product was inspected by Plaintiffs' representatives and determined to be counterfeit.

153.    For example, shown below is an image of an authentic Balenciaga "Pads Riding Sandal," which retails for $605.  The product displayed below bears Balenciaga's federally registered Balenciaga trademark name.  *See* Ex. 2 (U.S. Reg. No. 1,018,311).



154.    In comparison, set forth below is an image of a Counterfeit Product offered for sale to the public through Taobao.com by Merchant Defendant Ladylidy Shop until this Merchant Defendant was enjoined.  The price of the shoes, 320 RMB, is approximately $52. Although it is obvious that Ladylidy Shop was selling Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the authentic Balenciaga sandal shown above

and bears an exact copy of Balenciaga's federally registered trademark name.  The Counterfeit Product was intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Balenciaga product.  And upon inspecting the product shown above, Plaintiffs' representatives verified that the shoes are, indeed, counterfeit.  The Counterfeit Product displayed below was purchased from Ladylidy Shop by Plaintiffs' investigator through Taobao.com on or about May 31, 2014, for shipment to New York.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction was processed through Alipay.



155.    As a result of the Alibaba Defendants' inspection of Ladylidy Shop's business, and the fact that the merchant sells "Balenciaga" shoes for approximately $52 per pair, the Alibaba Defendants knew and should have known that this merchant was selling counterfeit shoes bearing the Balenciaga Marks.  Despite this knowledge, the Alibaba Defendants continued to provide the marketplace, advertising, and other essential services to this Merchant Defendant, including the payment processing services that allowed Ladylidy Shop to continue to sell its counterfeit "Balenciaga" shoes.

156.    As a result of the combination of the patently false price points of these items with the blatant use of Plaintiffs' Marks and other information known to the Alibaba Defendants about these Merchant Defendants and the products that they offered for sale, the Alibaba

Defendants knew and should have known that the goods described above were Counterfeit Products, knowingly allowed the Merchant Defendants to offer the Counterfeit Products on the Taobao Marketplace, and provided additional services including online marketing, payment processing, and shipping services to the counterfeiters.

157.    On information and belief, the Alibaba Defendants also knew and should have known that some or all of the Merchant Defendants described above were, and that other similarly situated merchants are selling Counterfeit Products because Plaintiffs or other brand owners have previously reported such merchants or their business partners to the Alibaba Defendants.

### C.    AliExpress.com

158.    AliExpress.com, a "global consumer marketplace that enables exporters in China to reach and directly transact with consumers around the world,"[67] also knowingly provides a marketplace for merchants engaged in the sale of the Counterfeit Products.

159.    As of June 4-6 2014, there were at least 131 merchants selling counterfeit Gucci products on AliExpress.com.

160.    As of June 4-6, 2014, there were at least 1,000 merchants selling counterfeit Bottega Veneta products on AliExpress.com.

161.    Shown below is an image of an authentic YSL T-shirt, which retails for $295. The product displayed below bears YSL's federally registered trademark YSL name.  *See* Ex. 4 (U.S. Reg. Nos. 1,712,999; 1,711,127).

---

[67]   F-1 at 74.



162.    In comparison, set forth below is an image of a Counterfeit Product offered for

sale to the public through AliExpress.com by Merchant Defendant Fashion Zone Ltd. ("Fashion

Zone") until this Merchant Defendant was enjoined.  The price of the T-shirt was $14.99 per

piece.  Although it is apparent that Fashion Zone was selling Counterfeit Products from its

electronic store, the Counterfeit Product mimics the logo and design of the authentic YSL T-shirt

shown above and bears an exact copy of YSL's federally registered trademark name.  The

Counterfeit Product was intended to confuse both the ultimate retail consumer and persons

observing the ultimate consumer into believing that it is a genuine YSL product.



163.    The Counterfeit Product above was purchased from Merchant Defendant Fashion

Zone through AliExpress by Plaintiffs' investigator on or about June 1, 2014, for shipment to

New York.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction

was processed through Alipay.  The T-shirt was received on or about June 23, 2014.  Plaintiffs'

representatives inspected the T-Shirt sold by Fashion Zone and confirmed that it is counterfeit.

164.     As a result of the fact that Fashion Zone offered a $295 T-Shirt for $14.99 and other information known to the Alibaba Defendants about Fashion Zone and the products that it offered for sale, the Alibaba Defendants knew and should have known that Fashion Zone was selling Counterfeit Products, knowingly allowed the merchant to offer its Counterfeit Products on AliExpress, and provided additional critical services—including online marketing, payment processing, and shipping services—to this Merchant Defendant that allowed Fashion Zone to continue to sell its Counterfeit Products.

165.     Further, shown below is an image of an authentic Gucci "Original GG Canvas Diaper Bag Tote," which retails for $795.  The product displayed below bears Gucci's federally registered trademark GUCCI name, repeating "GG" design, and green-red-green stripe.  *See* Ex. 1 (U.S. Reg. Nos. 878,292; 4,229,081; 1,122,780).



166.     In comparison, set forth below is an image of a Counterfeit Product offered wholesale to the public through AliExpress.com by Merchant Defendant Star Factory until this Merchant Defendant was enjoined.  The price of the handbag was $9.90.  Although it is apparent that Star Factory was selling Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the handles and ornamentation of the authentic Gucci handbag shown above and bears an exact copy of Gucci's federally registered trademark name, repeating

"GG" design, and green-red-green stripe.  The Counterfeit Product was intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



167.    The Counterfeit Product above was purchased from Merchant Defendant Star Factory through AliExpress by Plaintiffs' investigator on or about June 1, 2014, and was shipped to the United States and received on or about June 12, 2014.  Plaintiffs' investigator paid for the order using a Visa credit card and the transaction was processed through Alipay.  Plaintiffs' representatives inspected the above item sold by Star Factory and confirmed that the bag is counterfeit.

168.    As a result of the fact that Star Factory offered a $795 handbag for $9.90 and other information known to the Alibaba Defendants about Star Factory and the products that it offered for sale, the Alibaba Defendants knew and should have known that Star Factory was selling Counterfeit Products, knowingly allowed the merchant to offer the Counterfeit Products on AliExpress, and provided additional critical services including online marketing, payment processing, and shipping services that allowed Star Factory to continue to sell its Counterfeit Products.

169.    On information and belief, the Alibaba Defendants also know that some or all of the Merchant Defendants described above were and other similarly situated merchants are selling

Counterfeit Products because Plaintiffs or other brand owners have previously reported such merchants or their business partners to the Alibaba Defendants.

170.    AliExpress.com suggests keywords designed to steer consumers to the Counterfeit Products.  For example, typing the search term "Gucci" resulted in suggested keywords "cucci," "cucci bags," "guchi," "guchi bags," and similar.  The sellers using these misspellings in their listings are selling products using copies of Plaintiffs' registered trademarks.



171.    A search performed on or around June 6, 2014, using the keyword "guchi" yielded 211 results, including sellers offering goods bearing the Gucci Marks.  Below is one such example of a seller, a merchant using the name Xiaohui Jin's Store, which offered Counterfeit Products and described the items as "as good as the original ones, but not as dear as original ones in your country."



77



172.    Xiaohui Jin's Store also offered products advertised as Bottega Veneta, as shown below.



173.    The Xiaohui Jin's Store web page included language below the Counterfeit Products indicating the products were "replicas."

these item are not so good. Instead, they are as good as the original ones, but not as dear as original ones in your country.

If you want to tell the difference between Authentic and OEM form Hong Kong, a magnifying glass is necessary.

To be brief, our items have high quality and low price but the highest cost performance! You can buy this kind of special offer from us at a low price due to China as World Manufactory and have power debase price but keep high quality. We have a department store in Nanjing road in Shanghai and another store in EBay. Although we come to aliexpress not very long time, you will remember the Xiaohui Jin at first deal with us. We offer big discount to wholesaler! We delete the item close out isochronous, so every item display you can see is in stock. You can see it, you can buy it and you can get it. So even we are not online, you can buy it now. When you see your items, you must like it. If our store has not what you want, you can leave a message at any item below. We will stock the item you have asked before as soon as possible.

174.    Xiaohui Jin's Store was clearly engaged in violations of the Lanham Act as shown by its use of Plaintiffs' Marks and its language admitting the goods were not authentic. The Alibaba Defendants knew and should have known that Xiaohui Jin's Store was selling Counterfeit Products as a result of this admission.  The Alibaba Defendants enabled this self-proclaimed seller of counterfeits to effectuate sales of the Counterfeit Products by providing the marketplace and other services, including payment processing services.

175.    In addition, the search results for the keyword "Cucci" include merchants using the term "Cucci" in their seller listing, but offering for sale products bearing Plaintiffs' Marks.

176.    Intentional misspellings such as "guchi" and "cucci" are deliberately suggested to web browsers of AliExpress.com by the Alibaba Defendants, and are designed to allow the merchant to evade detection by brand owners.  They show that the Alibaba Defendants knew and should have known the Merchant Defendants were selling counterfeits but continued to provide the marketplace for the sale of Counterfeit Products and to sell keywords to the counterfeiters.

177.    Moreover, AliExpress.com also actively suggests merchants to its customers based on the customers' recent orders, including merchants selling Counterfeit Products. AliExpress.com claims that it recommends "some of [its] best suppliers" to "help [consumers] trade more safely."

178. For example and without limitation, AliExpress.com suggested, based on Plaintiffs' investigator's previous purchases, that Plaintiffs' investigator might be interested in an AliExpress.com merchant selling the bag depicted below (bearing Gucci's federally registered trademark name, repeating "GG" design, and green-red-green stripe), offered at $15.71.



### V.   The Alibaba Defendants' Unauthorized Sale of Plaintiffs' Marks as Keywords

179. A keyword is a particular word or phrase that is designed to lead Internet users to a particular Web page or search result.  Keywords generally act as shortcuts or triggers that cause specific types of search results to appear in response to a search that is being conducted through a website's search function.  In many cases, keywords are linked to specific results, or web pages, through the metadata that such pages or results use to help search engines match a page with a corresponding search query.  Thus, in the case of an online marketplace such as the Alibaba Marketplaces, if a merchant wants to attract people who search for a term like "gucci," he or she may register or purchase the keyword "Gucci" so that his or her Web page or listing will appear in response to the search.  In particular, the Alibaba Defendants' websites often "sell" rights to use trademark terms like "Gucci" so that their counterfeiter clients can make sure that Internet users who search the term "Gucci" will see a list of search results that includes the seller's offer of counterfeit Gucci products.  Importantly, the results that are triggered by the use

of such keywords are typically given the most prominent placement on a search results page, such as in the top right position, and are not meaningfully distinguished from the results that are generated through the Alibaba Defendants' algorithmic search processes, such that when consumers who enter trademarks like "Gucci" as a search term, they are likely to be confused into believing that the Alibaba Defendants are communicating to consumers that the links to counterfeiter merchants generated by such keyword triggers are the most direct way to buy products that bear the brand of the trademark that they have searched.  In this way, the Alibaba Defendants directly cause consumer confusion as to the origin, authorization, sponsorship, and affiliation of the merchants who have bought trademarks as keywords and the products that such merchants sell, despite the fact that many, if not most, such products are, in fact, Counterfeit Products.

180.    The Alibaba Defendants derive significant revenue from the sale of keywords to merchants on the Alibaba Marketplaces.

181.    Through Alimama's P4P services, Alibaba Marketplace merchants can bid for keywords that appear in search or browser results in connection with their product or service listings on a cost-per-click basis.[68]

182.    Through their proprietary marketing platform Alimama, the Alibaba Defendants sell Plaintiffs' Marks and words such as "cucci" and "guchi" that are designed to mimic Plaintiffs' Marks as keywords for use on the Alibaba Marketplaces, thereby communicating to consumers that they can purchase items bearing the Plaintiffs' Marks through the Alibaba Marketplaces.

---

[68]   F-1 at 89.

183.    For example and without limitation, the following is a list of search results triggered by typing Plaintiffs' Marks into the search engine on Taobao.com obtained on or around June 26, 2014:

      a.   Gucci:  119,000 listings

      b.   Balenciaga:  17,000 listings

      c.   Bottega Veneta:  42,300 listings

      d.   YSL:  23,500 listings

      e.   Yves Saint Laurent:  2,543 listings

184.    For example and without limitation, the following is a list of search results triggered by typing Plaintiffs' Marks into the search bar on Alibaba.com on or around June 26, 2014.

      a.   Gucci:  984 listings

      b.   Balenciaga: 27 listings

      c.   Bottega Veneta:  27 listings

      d.   YSL: 7,937 listings

      e.   Yves Saint Laurent:  26 listings

185.    A significant portion of these search results are sellers who are not selling authentic Plaintiffs' Products, but rather are either selling Counterfeit Products or making other infringing uses of Plaintiffs' Marks.

186.    The Alibaba Defendants sell the right to use Plaintiffs' Marks as keywords to merchants that the Alibaba Defendants know are engaged in the sale of Counterfeit Products.

187.    Plaintiffs did not authorize the Alibaba Defendants to sell Plaintiffs' Marks as keywords.

188.     In addition to their unauthorized sale of the Plaintiffs' Marks as keywords, the Alibaba Defendants also suggest related keywords containing confusingly similar marks to Internet browsers that are intended to steer those browsers to the Merchant Defendants selling Counterfeit Products.

189.     The Alibaba Defendants and their algorithms and data systems are sophisticated enough to know that certain terms are confusingly similar to trademark terms like "Gucci." Thus, the Alibaba Defendants understand that if their systems are designed to "suggest" such confusingly similar terms to Internet users, then a significant number of Internet users either will mistakenly search the confusingly similar term or understand that it is the best way to find Counterfeit Products.  For example, as noted above, AliExpress.com suggests the terms "cucci," and "guchi" either to steer customers to Counterfeit Products or to confuse the customers who may believe they are being presented with genuine Gucci Products.

## VI.     Alipay's Processing of Counterfeit Sales Through the Alibaba Marketplaces

190.     The Alibaba Defendants could not have sold the Counterfeit Products through their online retail marketplaces without Alipay's payment processing and escrow services.  The Alibaba Defendants rely on Alipay to conduct "substantially all of the payment processing and escrow services" on their online marketplaces.[69]

191.     The Alibaba Group established Alipay in 2004 to provide "security, trust, and convenience" to its buyers and sellers on its retail marketplaces, including the Taobao Marketplace, and certain other sites.[70]

---

[69]   F-1 at 25.

[70]   F-1 at 2.

192.     Alipay facilitates transactions within the Alibaba Marketplaces through its payment processing services, which provide convenience and ease to consumers.  The Alibaba Marketplaces' consumers have the option of paying for purchases with personal Alipay accounts, credit cards, or transfers from online banks.  Purchases made with personal Alipay accounts, credit cards, or bank transfers are settled through Alipay's escrow and payment processing services.  Thus, Alipay is critically involved in the majority of purchases made through the Alibaba Marketplaces.

193.     Alipay also facilitates transactions within the Alibaba Marketplaces through its escrow services, which provide security and trust to consumers.  When an Alibaba Marketplace consumer makes a purchase, Alipay transfers the consumer's funds into an escrow account.  Alipay releases the funds from escrow to the merchant seller when the consumer either confirms receipt of the goods purchased in satisfactory condition or fails to object to the release of funds within a specified period of time.[71]  The escrow function is critical to the sale of goods on the Alibaba Marketplaces because it eliminates uncertainty in making purchases over the Internet.

194.     There is substantial common ownership of Alipay and the other Alibaba Defendants.  Jack Ma, the founder of Alibaba Group, has a controlling position in both Alipay and the other Alibaba Defendants.

195.     The other Alibaba Defendants benefit economically from Alipay through the contractual arrangements with "preferential terms" to the other Alibaba Defendants.[72]  The Alibaba Group derives revenue through commissions for transactions settled through Alipay.[73]  For example and without limitation, the primary revenue from international commercial retail

---

[71]  F-1 at 178.

[72]  F-1 at 178, 224.

[73]  F-1 at 89.

marketplaces, including AliExpress, is derived from commissions—generally 5% of gross merchandise volume—for transactions settled through Alipay.[74]  The Alibaba Group also receives royalty fees and software technology service fees from Alipay.[75]

196.    The Alibaba Defendants also benefit from Alipay's provision of valuable consumer data, free of charge, that the other Alibaba Defendants use for their "data management platform, audience targeting, credit analysis, and detecting, monitoring and investigating traffic hijacking and fraudulent activities."[76]

197.    Alipay is admittedly "critical" to the Alibaba Marketplaces,[77] and to the "success and the development of [the Alibaba Defendants'] ecosystem."[78]  Alipay is a "key driver" of the Alibaba Defendants' success.[79]

198.    In light of the above-described connections and the joint and common ownership between the Alibaba Defendants and Alipay (including but not limited to Alibaba CEO Ma), the Alibaba Defendants have effective, practical, and beneficial control of Alipay, and Alipay operates as an integrated part of the Alibaba "ecosystem."

199.    Each of the purchases of the Counterfeit Products made by credit card from the Merchant Defendants discussed above was processed by Alipay.

200.    Merchant Defendants that sold the Counterfeit Products through the Alibaba Marketplaces would have been unable to complete such sales without the financial services provided by Alipay.

---

[74]  F-1 at 90.

[75]  F-1 at 107.

[76]  F-1 at 225.

[77]  F-1 at 25.

[78]  *Id.*

[79]  Leesa Shrader, "Microfinance, E-Commerce, Big Data and China: The Alibaba Story," CGAP (Oct. 11, 2013).

201.    As a PRC regulated financial institution, Alipay is subject to regulations requiring it to prevent money laundering, "including the adoption of precautionary and supervisory measures, establishment of various systems for client identification, preservation of clients' identification information and transactions records, and reports on block transactions and suspicious transactions."[80]

202.    Additionally, because Alipay settles credit card transactions, it is subject to regulations imposed by the credit card associations.  As explained by the Federal Financial Institutions Examination Council ("FFIEC"), a merchant must be sponsored by an acquiring bank that is a member of the credit card association in order to accept Visa or MasterCard payments.[81]  Alipay thus either itself qualifies as an acquiring bank or has a third party relationship with a bank that acts as acquiring bank in all transactions settled by Alipay.

203.    The credit card networks require the acquiring bank to be the risk-controlling entity throughout the credit card process.  This means that the acquiring bank is responsible for "chargebacks"—customer disputes of credit card charges—as "the acquiring bank bears the financial obligation if the merchant fails to pay."[82]  The acquiring bank is also responsible for credit and fraud risks presented by merchant accounts acquired through third parties.[83]  The FFIEC recommends that "[f]or online merchants, the screening process should include a review of Web site content" and online merchants "should be monitored closely to ensure no illegal or high-risk business activity is being conducted."[84]

---

[80]  F-1 at 199.

[81]  FFIEC IT Examination Handbook Infobase, Audit, "Merchant Acquiring," at 1.

[82]  *Id.*  at 4.

[83]  *Id.* at 5.

[84]  *Id.* at 4.

204.     Accordingly, Alipay has an obligation to the card networks (and/or to the third party acquiring bank through which it contracts to gain access to the credit card networks), and a strong financial incentive—because it is ultimately required by the credit card associations to refund chargebacks to customers—to perform the appropriate level of diligence on its merchants that would entail determining whether a merchant is selling illegal goods.

205.     As a result of Alipay's extensive knowledge of its online sales transactions and the diligence it is required to perform on its merchants, Alipay has actual knowledge that it is providing payment processing services to merchants selling Counterfeit Products.

**VII.     The Alibaba Defendants Are an Indispensable Part of the Enterprise to Sell the Counterfeit Products, Resulting in Consumer Confusion and Harm to Plaintiffs**

206.     The Merchant Defendants could not have sold Counterfeit Products through the Alibaba Marketplaces but for the Alibaba Defendants' operation of online marketplaces and other sites, as well as the Alibaba Defendants' role connecting online consumers to online merchants selling the Counterfeit Products.[85]

207.     The Alibaba Defendants have provided, and continue to provide, essential services to online merchants engaged in the sale of Counterfeit Products.

208.     The Alibaba Defendants have been indispensable participants in the sale of the Merchant Defendants' Counterfeit Products.  The Alibaba Defendants provided the marketplaces for the sales of Counterfeit Products and facilitated the financing and commercial operations of the merchants selling Counterfeit Products by providing marketing services that direct buyers to the Counterfeit Products, including selling Plaintiffs' Marks as keywords, offering its merchants

---

[85]   F-1 at 1.

micro loans, processing online payment transactions for the Counterfeit Products, and shipping the Counterfeit Products to consumers.

209.   The Alibaba Defendants knew and should have known that they were facilitating the Merchant Defendants' sale of Counterfeit Products.

210.   The Alibaba Defendants use marketing and data collection services—namely, "data intelligence" and "deep learning"—to direct consumers to the Counterfeit Products offered for sale through their marketplaces.[86]

a.   The Alibaba Defendants use their data management platform to work with their online merchants in order to "enhance understanding of their customer data and to direct targeted marketing to a broader base of consumers with similar attributes."[87] Indeed, in its Form F-1, Alibaba Group acknowledges that the "data from consumer behavior and transactions completed on [its] marketplaces and interactions among participants in [its] ecosystem" provide the Alibaba Defendants with "valuable insight" to help the Alibaba Defendants and their online merchants "improve the buyer experience,"[88] "target and acquire customers,"[89] and "increase the rate of conversion from visits to transactions."[90]

b.   The Alibaba Defendants use consumer behavior data to create a better shopping experience for their consumers "by personalizing search results and shopping

---

[86]   F-1 at 145.

[87]   F-1 at 144.

[88]   F-1 at 7.

[89]   F-1 at 144.

[90]   F-1 at 145.

recommendations."[91]  Indeed, in its Form F-1, Alibaba Group states that the Alibaba Defendants "make predictions of click through rates and conversion rates of online marketing messages" based on "deep learning" and "rich consumer data" generated from their China retail marketplaces.[92]

    c.   The Alibaba Defendants insert specific keywords into their metadata in an effort to connect consumers to the types of products that the Alibaba Defendants believe their consumers are searching for, based on the search terms that they use in their searches, and the Alibaba Defendants insert additional terms and phrases into their metadata in order to direct consumers to particular categories of counterfeit goods.

211.    The Alibaba Defendants also provide substantial assistance in the form of infrastructure support and financing to their online merchants selling Counterfeit Products.

    a.   The Alibaba Defendants provide essential support services that enable the sale of Counterfeit Products on their online platforms, including "Web-based and mobile interfaces to manage listings, orders, and customer relationships, and cloud computing services" for their enterprise resource planning and client relationships management.[93]

    b.   The Alibaba Defendants arrange shipping and delivery services that enabled the Merchant Defendants to provide buyers with Counterfeit Products.  The Alibaba Group's 48%-owned affiliate, China Smart Logistics (Zhejiang Cainiao Supply Chain Management Co., Ltd.), operates a central logistics information system that

---

[91]  F-1 at 144.

[92]  F-1 at 182.

[93]  F-1 at 148.

works with third-party logistics and delivery companies.  Through this affiliate,
Merchant Defendants were able to arrange for the shipping and delivery of, *inter
alia*, Counterfeit Products.[94]

c.  The Alibaba Defendants finance certain online merchants, including, on
information and belief, Merchant Defendants that sold Counterfeit Products, by
providing micro loans to small and medium-sized enterprises ("SME") that sell on
both their wholesale and retail marketplaces and often have trouble accessing
credit from large banks.[95]  The loans range from 7 to 360 days and are extended
based on "transactional and behavioral data from sellers" used to assess their
credit-worthiness.[96]  The loans are unsecured and merchants are required to
engage in three months of activity on the Alibaba Marketplaces in order to
qualify.[97]  As of December 31, 2013, the SME loan business had over 342,000
borrowers and a total outstanding loan balance, net of allowance for "doubtful
accounts," of $2 billion.[98]

d.  The Alibaba Defendants' provision of unsecured loans to an online merchant is
based on an understanding of the seller's business that would indicate when a
seller is engaged in the sale of Counterfeit Products and, on information and
belief, the Alibaba Defendants knowingly provided such loans to Merchant
Defendants who sold Counterfeit Products until enjoined by this Court.

---

[94]  F-1 at 100.

[95]  F-1 at 38; Leesa Shrader, "Microfinance, E-Commerce, Big Data and China: The Alibaba Story," CGAP (Oct.
11, 2013).

[96]  *Id.*

[97]  *Id.*

[98]  *Id.*

e.   Defendant Alipay provides "substantially all" payment processing and escrow services for transactions made through the Alibaba Marketplaces, and processed each purchase of the Counterfeit Products made by credit card as described in this Complaint.

f.   The Alibaba Defendants disclose in their Form F-1 that "[o]ur ability to maintain our position as a trusted platform for online and mobile commerce is based in large part upon our ability to provide reliable and trusted payment and escrow services through our arrangements with our related company Alipay."[99]

212.   The Alibaba Defendants have derived substantial profits from the sale of Counterfeit Products through the Alibaba Marketplaces.

a.   In the year ended March 31, 2014, the Alibaba Defendants generated $8.4 billion in revenue and $3.7 billion in net income.[100]  The revenue from their international retail business increased two-fold from the same period in 2012, due to a substantial increase in gross merchandise volume transacted on AliExpress.com, primarily from transactions with buyers in the United States, Russia, and Brazil.[101]

b.   The Alibaba Defendants derive revenue primarily from their online marketing services, including their P4P service that allows online merchants to bid for keywords that direct buyers to, *inter alia*, Counterfeit Products, and commissions received for each sale of a Counterfeit Product settled through Alipay.[102]  The Alibaba Defendants have generated substantial profits from the sale of keywords

---

[99]   F-1 at 22.

[100]   F-1 at 16, 17.

[101]   F-1 at 105.

[102]   F-1 at 89.

that incorporate Plaintiffs' Marks or confusingly similar variations of Plaintiffs'

Marks.  The Alibaba Defendants also derive revenue from subscription and

membership fees, their cloud computing and Internet infrastructure services, and

their SME loan business, all of which serve to facilitate Counterfeit Sales through

the Alibaba Marketplaces.  The Alibaba Defendants have generated substantial

profits from sales of Counterfeit Products.  In addition, the Alibaba Defendants

generate revenue from their "international commerce retail marketplaces,

primarily AliExpress, through commissions, which are generally 5% of gross

merchandise volume for transactions settled through Alipay."[103]  AliExpress has

generated substantial revenue from the sale of Counterfeit Products.

    c.   Defendant Alipay derives revenue from each payment transaction for which it

provides processing and/or escrow services, including such services provided in

connection with the sale of the Counterfeit Products made through the Alibaba

Marketplaces.

### VIII.   The Alibaba Defendants' Unwillingness to Refrain from Trademark Infringement

213.    The Alibaba Defendants have received numerous complaints that, through their

marketplaces, items infringing third-party copyrights, trademarks, patents or other intellectual

property rights have been offered for sale or sold.[104]

214.    Alibaba has been subject to PRC and other foreign government inquiries and

investigations regarding, *inter alia*, its website content and claims of intellectual property

infringement.[105]

---

[103]   F-1 at 89.

[104]   F-1 at 32.

215.     The Alibaba Defendants purport to have implemented certain measures in an attempt to prevent counterfeit goods from being offered for sale through the Alibaba Marketplaces, including: (1) identifying and issuing warnings and taking down counterfeit products; (2) providing an online complaint platform for the reporting of infringements; (3) conducting random checks by using third parties to purchase suspected counterfeit goods on the Alibaba Marketplaces; and (4) enhancing communications with government authorities about eradicating the sources of counterfeit goods.[106]

216.     More specifically, sometime after August 2013, the Alibaba Defendants updated their "counterfeiting punishment rules" for the Taobao Marketplace with the stated purpose of establishing a "Progressive Penalty System for counterfeit" (hereinafter, the "Progressive Penalty System"). The Progressive Penalty System seeks to "separate counterfeit from other infringement," and purports to "focus[] on repeat offenders."[107]

217.     The Progressive Penalty System targeting sellers of counterfeit goods on the Taobao Marketplace operates in a "4 Strikes" structure: (1) warning; (2) penalties accumulated; (3) heavier penalties with repeated offenders; and (4) severe penalties.[108] Penalties are measured in "points," which are accumulated by an Internet merchant based on the following criteria:

     a.   2 points per link if the item sold is suspected to be fake ("Suspicious counterfeit");

---

*(Cont'd from previous page)*

[105]   F-1 at 35.

[106]   F-1 at 180.

[107]   Alibaba Group, *Updates on Taobao IP protection*, at 3.

[108]   Alibaba Group, *Updates on Taobao IP protection*, at 4.

b. 12 points per link if the item is confirmed to be fake through purchasing or any other method ("Confirmed counterfeit");

c. 24 points per link for a serious situation of counterfeiting ("Serious situation"); and

d. 48 points per link for a particularly serious situation of counterfeiting ("Particularly serious situation").[109]

218. This Progressive Penalty System is not designed to prevent the sale of Counterfeit Products.

a. Although an Internet merchant who receives punishment of between 24 and 47 points in one year will not be "cleared" at the end of that year, that merchant— who, according to the Alibaba Defendants' own labeling system, perpetrated a "Serious situation" of counterfeiting—will be allowed to continue to sell products on the Alibaba Marketplaces in the following year (the merchant simply starts the new year with half of the punishment points it received in the prior year). Despite these procedures, the Alibaba Defendants routinely refuse to prohibit Internet merchants who receive punishment in excess of 24 points.

b. Although the store of an Internet merchant who receives 24 points for a "Serious situation" of counterfeiting is deleted, the merchant is only blocked from the website for 21 days.[110] Similarly, the store of an Internet merchant who receives a 12 point deduction is only blocked from the website for 14 days.[111]

---

[109]   Alibaba Group, *Updates on Taobao IP protection*, at 3.

[110]   Taobao IPR Enforcement Policy.

[111]   Taobao IPR Enforcement Policy.

    c.   An account is only permanently closed, and delivery limited, if a merchant

       reaches 48 points.[112]

219.    In addition, Alibaba.com and AliExpress.com updated their Intellectual Property

Rights Protection Policy on or about February 10, 2014.[113]  Alibaba.com and AliExpress.com's

Policy purports that "[l]istings of counterfeits, replicas, or other unauthorized items are

prohibited on [their sites] strictly."[114]

220.    Under the Policy, Alibaba.com and AliExpress.com award penalty points to

merchants offering infringing products and take certain enforcement actions based on the number

of penalty points awarded.  Both Alibaba.com and AliExpress.com award 6 penalty points per

infringement when the intellectual property right owner is the complainant.[115]

221.    Alibaba.com takes the following enforcement actions against merchants based on

the following number of penalty points incurred:

    a.   6 points:  issuance of a severe warning.

    b.   12 points:  prohibition of product posting for 7 days.

    c.   24 points:  blocking of search results for 7 days and restriction of Request for

       Quotation (RFQ) for 1 month.

    d.   36 points:  blocking of search results for 14 days and restriction of Request for

       Quotation (RFQ) for 3 months.

---

[112]  Taobao IPR Enforcement Policy.

[113]  Intellectual Property Rights (IPR Policy), available at
http://www.alibaba.com/help/safety_security/policies_rules/IPR/002.html.

[114]  *Id.*

[115]  Alibaba.com Enforcement Actions for Intellectual Property Right Infringement Claims, available at
http://www.alibaba.com/help/safety_security/policies_rules/IPR/003.html; AliExpress Enforcement Actions for
Intellectual Property Right Infringement Claims, available at http://help.aliexpress.com/ipr_penalty.html.

  e. 48 points: termination of membership.[116]

  222. AliExpress.com takes the following enforcement actions against merchants based on the following number of penalty points incurred:

  a. 2 points: severe warning.

  b. 6 points: product listing operations restricted for 3 days.

  c. 12 points: product listing operations restricted for 7 days.

  d. 24 points: product listing operations restricted for 14 days.

  e. 36 points: product listing operations restricted for 30 days.

  f. 48 points: account terminated.[117]

  223. Alibaba.com and AliExpress.com's Intellectual Property Rights Protection Policy is also not designed to prevent the sale of Counterfeit Products.

  a. Although a merchant is awarded 6 points per infringement, the Policy makes it difficult for merchants to incur more than 6 points from one complainant.  All complaints received from a complainant within five days of the first complaint count as one infringement and the five days is tolled until the first complaint has been processed.  Thus, it could be weeks before a merchant incurs additional points for offering for sale and selling Counterfeit Products.[118]

---

[116] Alibaba.com Enforcement Actions for Intellectual Property Right Infringement Claims, available at http://www.alibaba.com/help/safety_security/policies_rules/IPR/003.html.

[117] AliExpress Enforcement Actions for Intellectual Property Right Infringement Claims, available at http://help.aliexpress.com/ipr_penalty.html.

[118] Alibaba.com Enforcement Actions for Intellectual Property Right Infringement Claims, available at http://www.alibaba.com/help/safety_security/policies_rules/IPR/003.html; AliExpress Enforcement Actions for Intellectual Property Right Infringement Claims, available at http://help.aliexpress.com/ipr_penalty.html.

b.  In addition, a merchant's membership is not terminated until it incurs 48 points, or until a complainant has complained and Alibaba has processed the complaint eight times.[119]

c.  Further, Alibaba.com's penalty points are only on record for 365 days.  A merchant that has been punished for selling Counterfeit Products up to seven times in one year will be allowed to continue to sell products the next year.[120]

224.    On or about June 16, 2014, the Alibaba Defendants issued a press release stating that they would transition to a "three strikes" policy on Alibaba.com and AliExpress.com for merchants selling Counterfeit Products.  After the first strike, the merchant would receive a warning.  After the second strike, all product listings would be removed from the merchant's store front and all listings would be removed from search results for 7 days.  After the third strike, the merchant would be banned from the site.[121]

225.    The new "three strike" policy is not designed to prevent merchants from offering counterfeit goods on the Alibaba.com, AliExpress.com amd Taobao.com sites.  Among other flaws, the Alibaba Defendants' purported "three strike" policy allows merchants to continue to sell Counterfeit Products as long as they are not caught selling products that infringe on identical trademarks on three different dates.  For example, if a counterfeiter is caught offering a counterfeit version of one of Gucci's products on one day and then is caught offering a counterfeit version of a different Gucci mark on a second day, the Alibaba Defendants do not consider that merchant to have earned two "strikes," and the merchant can continue to offer

---

[119]  *Id.*

[120]  Alibaba.com Enforcement Actions for Intellectual Property Right Infringement Claims, available at http://www.alibaba.com/help/safety_security/policies_rules/IPR/003.html.

[121]  http://www.alizila.com/why-alibabacom-and-aliexpress-are-tightening-anti-counterfeit-policies.

Counterfeit Products until they are caught offering products that infringe on at least four separate occasions.  In addition, Alibaba considers one report of counterfeit offerings to be one "strike" no matter how many individual Counterfeit Products or types of Counterfeit Products the merchant is offering.  In other words, Alibaba will continue to allow a merchant to sell Counterfeit Products  even after receiving a report of listings of thousands of Counterfeit Products being offered for sale.

226.   On information and belief, the Alibaba Defendants have entered into agreements with other brands in which the Alibaba Defendants have agreed to do more to combat counterfeiting.  However, those agreements have not resulted in any appreciable difference in the number of counterfeit goods offered for sale on the Alibaba Defendants' websites.

227.   On or around December 2013, the Alibaba Defendants also updated their "strategy to monitor allegedly online infringing listings" on the Taobao Marketplace (hereinafter, the "Listing Monitoring Strategy").[122]  Whereas the previous strategy for removing infringing listings admittedly suffered from a "lack of significant, long-lasting results," and "[d]ifficulty finding direct solutions," the new strategy purports to:  (1) monitor on a brand and item-specific basis; (2) evaluate search results; (3) target products that can be easily found by consumers; and (4) increase costs associated with selling counterfeit products.[123]

228.   The Alibaba Defendants have intentionally designed this Listing Monitoring Strategy such that it does not effectively prevent counterfeiters from selling Counterfeit Products.  The pretextual nature of the Listing Monitoring Strategy is illustrated by the numerous repeat infringers who are currently still active on the Alibaba Marketplaces, and the numerous

---

[122]   Alibaba Group, *Updates on Taobao IP protection*, at 6.

[123]   Alibaba Group, *Updates on Taobao IP protection*, at 6.

"Gold Suppliers" and "Assessed Suppliers" currently offering for sale Counterfeit Products on the Alibaba Marketplaces.

229.    The Alibaba Defendants have the ability to refrain from making infringing uses of proprietary marks as part of their P4P online marketing program.  Specifically, the Alibaba Defendants could reasonably prevent Plaintiffs' Marks and terms confusingly similar thereto from being used as keywords that match product or service listings appearing in search or browser results.  However, the Alibaba Defendants currently sell specific trademarks as keywords that generate results for merchants selling Counterfeit Products and revenue for the Alibaba Defendants.  Furthermore, on information and belief, at least until around the time of the filing of the Initial Action, the Alibaba Defendants had sold specific trademarks that incorporate Plaintiffs' Marks as keywords, generating results for merchants were offering Counterfeit Products and revenue for the Alibaba Defendants.

230.    The takedown procedures employed by the Alibaba Defendants are designed to give the false appearance that they are responsive to brand owners' concerns while the Alibaba Defendants continued their intentional hosting of the Merchant Defendants selling Counterfeit Products through the Alibaba Marketplaces.

231.    The Alibaba Defendants also assist Internet merchants in evading takedown notices and enforcement of trademark rights by delaying unreasonably in responding to complaints that are filed by a brand owner and by taking insufficient or nonresponsive steps in response.  For example, by way of illustration, while complaints to other online shopping sites "usually result in listings removed within 24 hours, it sometimes takes weeks for the [Alibaba Marketplaces] site[s] to react because the complaints often get rejected by their system

automatically."[124] As described more fully above, the Alibaba Defendants continued to allow numerous Merchant Defendants to sell Counterfeit Products following specific complaints by Plaintiffs' representatives that these Merchant Defendants were selling Counterfeit Products.

## IX.   Consumer Confusion and Harm to Plaintiffs

### A.   Plaintiffs' Marks As Keywords

232.   The Alibaba Defendants offer Plaintiffs' Marks, as well as terms that are confusingly similar to Plaintiffs' Marks, for sale to their online merchants as keywords to match the merchants' product and service listings that appear in search or browser results.

233.   When an online consumer enters one of Plaintiffs' trademark names into a web search toolbar featured on one of the Alibaba Marketplaces' websites, he or she will receive a display, listing products available for purchase through one of the Alibaba Marketplaces.  Many online consumers will view such listings in the belief that the products offered for sale are, in fact, Plaintiffs' Products precisely because they have searched for Plaintiffs' trademark names. The Alibaba Defendants, in fact, display search results in a format that is likely to and appears designed to confuse consumers into believing that the resulting listings offer authentic Plaintiffs' Products and/or are affiliated with, sponsored by, or endorsed by Plaintiffs.  In particular, the results that are triggered by the use of search terms that the Alibaba Defendants sell as keywords are typically given the most prominent placement on a search results page, such as in the top right position, and are not meaningfully distinguished from the results that are generated through the Alibaba Defendants' algorithmic search processes.

234.   Many online consumers who are presented with such a list of products are not aware that the online merchants selling the products may have no affiliation with Plaintiffs

---

[124]   NPR, *Knockoffs A Headache for IPO-Bound Alibaba*, at pg. 3 (internal citations omitted).

and/or may be offering Counterfeit Products.  The Alibaba Defendants' misappropriation of Plaintiffs' Marks as keyword triggers and the Alibaba Defendants' use of terms confusingly similar to Plaintiffs' Marks are therefore likely to cause confusion in the marketplace for luxury goods.

235.    Even if web users realize that a given online merchant is not affiliated with Plaintiffs, the damage to Plaintiffs has already been done.  A statistically significant percentage of consumers are likely to either purchase Counterfeit Products or elect not to purchase Plaintiffs' Products.  Web users may also associate the quality of the Counterfeit Products offered through the Alibaba Marketplaces with those offered by Plaintiffs, and if dissatisfied with such goods, may decide to avoid Plaintiffs' Products in the future.

236.    Although the above examples are illustrative of the problems created by the Alibaba Defendants, they by no means describe all the ways in which the Alibaba Defendants' uses of Plaintiffs' Marks as keywords in the Alibaba Marketplaces are likely to confuse consumers.  Because of the nature of the way the Alibaba Defendants have used Plaintiffs' Marks and display product offerings that incorporate those marks with terms associated with Counterfeit Products (e.g., inserting the term "synthetic leather" into the metadata on Alibaba.com alongside the keyword "Gucci" in order to direct consumers to Counterfeit Products when they typed "Gucci" into Alibaba.com's search toolbar), the Alibaba Defendants are either misleading or will mislead consumers in innumerable different ways.  Accordingly, it is impossible for Plaintiffs to cure this problem merely by pursuing remedies against the online merchants offering Counterfeit Products for sale through the Alibaba Marketplaces alone.

237.     Among other things, the following facts and circumstances support the conclusion that the Alibaba Defendants' use in commerce of Plaintiffs' Marks is likely to cause consumer confusion:

a.  Plaintiffs' Marks have acquired exceptionally strong secondary meaning over the course of the last century.

b.  The Alibaba Defendants use Plaintiffs' Marks or terms confusingly similar thereto as keyword triggers and display search results that are likely to confuse consumers into believing that the merchants who purchase such keywords are selling authentic Plaintiffs' Products or are affiliated with, sponsored by, or endorsed by Plaintiffs.

c.  Alibaba Marketplace merchants who purchase Plaintiffs' Marks or terms confusingly similar thereto as keywords generally sell products closely related to Plaintiffs' Products.

d.  Online consumers have actually been confused as a result of the Alibaba Defendants' conduct.

e.  The Alibaba Defendants began using Plaintiffs' Marks or terms very similar to Plaintiffs' Marks after they were registered and after they became famous and distinctive.  The Alibaba Defendants did so with full knowledge of Plaintiffs' rights in Plaintiffs' Marks.  In fact, it is the Alibaba Defendants' specific intent to use Plaintiffs' Marks as set forth in this Complaint to profit from online consumers' association of Plaintiffs' Marks with Plaintiffs' Products.

238.     Many of the online merchants to whom the Alibaba Defendants sell or offer the right or ability to use Plaintiffs' Marks or terms confusingly similar thereto, or on whose behalf

the Alibaba Defendants use such marks or terms, do not use such marks or terms to identify or describe Plaintiffs or their Products.

## B. Sales of Products Bearing Plaintiffs' Marks

239. Online merchants, including the Merchant Defendants, have used and are using the Alibaba Marketplaces to sell and/or offer for sale Counterfeit Products that bear Plaintiffs' Marks and copy the designs, patterns, and color schemes associated with Plaintiffs' Products.

240. The Alibaba Defendants knowingly provided the use of the Alibaba Marketplaces, online marketing services, and financing and shipping services to the Merchant Defendants and other counterfeiters that have sold and continue to sell Counterfeit Products through the Alibaba Marketplaces, and thereby participate in and/or facilitate the offering for sale and/or sale of such Counterfeit Products.

241. Alipay knowingly provides payment processing and escrow services to online merchants and consumers engaged in transactions for Counterfeit Products made through the Alibaba Marketplaces, and provides the Alibaba Defendants with data concerning such merchants and consumers, and thereby participates in and/or facilitates the sales of such Counterfeit Products.

242. When online consumers see, on the Alibaba Marketplaces, listings for Counterfeit Products bearing Plaintiffs' Marks and copying the designs, patterns, and color schemes associated with Plaintiffs' Products, many of those consumers will view such listings in the belief that the products offered for sale are, in fact, Plaintiffs' Products.

243. Certain online consumers who purchase those Counterfeit Products from the Alibaba Marketplaces' websites are not aware that the products have no affiliation with Plaintiffs. And even if web users realize that the Counterfeit Products are not affiliated with Plaintiffs, they may associate the quality of the Counterfeit Products offered through the Alibaba

Marketplaces with those offered by Plaintiffs, and if dissatisfied with such goods, may decide to avoid Plaintiffs' Products in the future.

244.    Certain online consumers purchase large quantities of the Counterfeit Products at wholesale for resale.  Because the Counterfeit Products are designed as exact copies of Plaintiffs' Products but of lower quality, the retail consumers of Counterfeit Products purchased wholesale from the Alibaba Marketplaces will be confused as to the origin of the goods.

245.    The Alibaba Defendants' participation in and facilitation of counterfeiters' sale of Counterfeit Products through the Alibaba Marketplaces is therefore likely to cause confusion in the marketplace for luxury goods.

246.    Online consumers have actually been confused as a result of Defendants' conduct.

247.    Defendants' actions have also created post-sale confusion among consumers exposed to the Counterfeit Products.  As a result of the widespread availability of the Counterfeit Products, consumers are likely to come in contact with the Counterfeit Products and may associate the quality of the Counterfeit Products offered through the Alibaba Marketplaces with the authentic products offered by Plaintiffs.

248.    Defendants' actions have caused, and will continue to cause, irreparable harm to Plaintiffs and an incalculable loss of goodwill and damages.

## FIRST CAUSE OF ACTION
## AGAINST THE ALIBABA DEFENDANTS
(Trademark Infringement Under Sections 32 and 43(a)
of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a))

249.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

250.    Plaintiffs' Marks are valid, federally registered trademarks entitled to protection under the Lanham Act.

251.    Plaintiffs' Marks and the goodwill of the businesses associated with them in the United States and throughout the world are of great and significant value, are highly distinctive and arbitrary, and have become universally associated in the public mind with products and services of the very highest quality and reputation.

252.    Defendants were knowing and willful participants and co-venturers in the marketing and sale of Counterfeit Products described above, making them jointly and severally liable for the marketing and sale of such Counterfeit Products.  As set forth in greater detail above, the Alibaba Defendants themselves make confusing uses of the Plaintiffs' Marks by selling Plaintiffs' Marks as keywords to third parties who are not affiliated with Plaintiffs and by creating a search system and response pages that are designed to confuse consumers into incorrectly believing that the Alibaba Defendants' merchant clients offer legitimate Plaintiffs' Products or are otherwise affiliated with, endorsed by, or sponsored by Plaintiffs.  The sale of wholesale quantities of the Counterfeit Products which are ultimately resold to retail consumers causes confusion among consumers seeking authentic Plaintiffs' Products.  Defendants' actions also cause post-sale confusion among consumers who come in contact with the Counterfeit Products and associate their inferior quality with Plaintiffs' Marks.

253.    Defendants' actions described above have caused and are likely to cause confusion and mistake and to deceive potential customers and the general purchasing public as to the source, origin, or sponsorship of their Counterfeit Products, and are likely to deceive the public into believing that the Counterfeit Products sold through the Alibaba Marketplaces

originate from, are associated with, or are otherwise authorized by Plaintiffs, all to the damage and detriment of Plaintiffs' reputation, goodwill, and sales.

254.    Defendants' infringement of Plaintiffs' Marks is willful and reflects Defendants' intent to exploit the goodwill and strong brand recognition associated with Plaintiffs' Marks.

255.    Defendants' participation in the unauthorized use of Plaintiffs' Marks constitutes trademark infringement of federally-registered Plaintiffs' Marks, the full extent of which is presently unknown but the known amount is substantial.  For example and without limitation, Defendants have been unjustly enriched through their unlawful and unauthorized sales of Counterfeit Products that are confusingly similar to Plaintiffs' Products or that otherwise bear, contain, display, or utilize any of Plaintiffs' Marks.  This has caused damage to Plaintiffs and the substantial business and goodwill symbolized by Plaintiffs' Marks in violation of Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a).

256.    Defendants' actions described above, including the unauthorized use of Plaintiffs' Marks in interstate commerce, have caused, and unless restrained will continue to cause, great and irreparable injury to Plaintiffs, to Plaintiffs' Marks, and to the business and goodwill represented thereby, leaving Plaintiffs with no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**AGAINST THE ALIBABA DEFENDANTS**
(Trademark Counterfeiting Under Sections 32, 34, and 35
of the Lanham Act, 15 U.S.C. §§ 1114(1)(b), 1116(d), & 1117(b)-(c))

257.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

258.    Without Plaintiffs' authorization or consent, and having knowledge of Plaintiffs' well-known and prior rights in Plaintiffs' Marks, Defendants have knowingly and willfully facilitated, financed, and participated in the distribution, advertisement, offering for sale, and/or

sale of Counterfeit Products to the consuming public in direct competition with Plaintiffs, in or affecting interstate commerce, and/or acted with reckless disregard to the rights of Plaintiffs in Plaintiffs' Marks in participating in such activities.

259.     The Counterfeit Products that are offered and sold to the public by way of the Alibaba Marketplaces and other services reproduce, counterfeit, copy, and colorably imitate the Plaintiffs' Marks or display spurious designations that are identical with, or substantially indistinguishable from, Plaintiffs' Marks.  Defendants have thus caused reproductions, counterfeits, copies, and colorable imitations of Plaintiffs' Marks to be applied to labels and advertisements to be used in commerce in connection with the sale and distribution of Counterfeit Products through the Alibaba Marketplaces, which is likely to cause confusion, to cause mistake, or to deceive.

260.     Defendants' participation, financing, and/or facilitation of this unauthorized use of Plaintiffs' Marks on or in connection with the Counterfeit Products was done with notice and full knowledge that such use was not authorized or licensed by Plaintiffs.  Defendants' actions constitute willful counterfeiting of Plaintiffs' Marks in violation of 15 U.S.C. §§ 1114(1)(b), 1116(d), and 1117(b)-(c).

261.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damage to their valuable Marks, and other damages in an amount to be proved at trial.

262.     Plaintiffs do not have an adequate remedy at law, and will continue to be damaged by Defendants' facilitation of and participation in the sale of Counterfeit Products unless this Court enjoins Defendants from such fraudulent business practices.

**THIRD CAUSE OF ACTION**
**AGAINST THE ALIBABA DEFENDANTS**
(Contributory Trademark Infringement and Counterfeiting Under the Lanham Act)

263.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

264.    Plaintiffs' Marks are valid, federally registered trademarks entitled to protection under the Lanham Act.

265.    Plaintiffs' Marks and the goodwill of the businesses associated with them in the United States and throughout the world are of great and significant value, are highly distinctive and arbitrary, and have become universally associated in the public mind with the products and services of the very highest quality and reputation.

266.    With full knowledge of Plaintiffs' rights in Plaintiffs' Marks, the Alibaba Defendants have provided the Alibaba Marketplaces, their online marketing, financing, shipping, payment processing, and/or escrow services to, and generated income from, the Merchant Defendants who sold Counterfeit Products bearing Plaintiffs' Marks through the Alibaba Marketplaces.  Based on the allegations set forth in greater detail above, the Alibaba Defendants either had or have contemporaneous knowledge that the goods bearing Plaintiffs' Marks being offered for sale through the Alibaba Marketplaces are or were, in fact, counterfeit or were willfully blind to the fact that such products were counterfeit.

267.    The Alibaba Defendants, by offering online marketing, financing, shipping, payment processing, and/or escrow services to the Merchant Defendants that allowed the Merchant Defendants to infringe upon Plaintiffs' Marks, aided, facilitated, participated in, and materially contributed to the sale of Counterfeit Products in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1116(d), 1117(b)-(c), and 1125(a).  For example and without limitation,

Defendant Alipay participated in the sales of Counterfeit Products by accepting the credit card numbers for the sales transactions of Counterfeit Products through the Alibaba Marketplaces, processing the transactions and paying the proceeds of the sales of the Counterfeit Products to the counterfeiter Merchant Defendants.  Further, and without limitation, the Alibaba Marketplaces participated in the sales of Counterfeit Products by knowingly allowing Internet merchants to offer Counterfeit Products for sale to consumers, including through the use of marketing techniques that infringed upon Plaintiffs' Marks.

268.    By providing critical online marketing, shipping, financing, payment processing, and/or escrow services to the Merchant Defendants, the Alibaba Defendants supplied the necessary marketplace for the sale of Counterfeit Products, and the Alibaba Defendants received a direct financial benefit for providing such services.

269.    The Alibaba Defendants exercised control over the means of the infringement and counterfeiting described above.  The Alibaba Defendants knowingly provided essential services to merchants selling Counterfeit Products through the Alibaba Marketplaces.  For example and without limitation:

  a.  Defendant Alipay handled the payment transactions for the infringing sales. Knowing that merchants used Alipay's payment processing and escrow services to facilitate the sale of Counterfeit Products through the Alibaba Marketplaces, the Alibaba Defendants nonetheless continued to provide such merchants with Alipay's services.

  b.  The Alibaba Marketplaces provided the marketplaces for the sales of Counterfeit Products and facilitated the financing and commercial operations of the Merchant Defendants selling Counterfeit Products by providing marketing services that

direct buyers to the Counterfeit Products, including selling Plaintiffs' Marks as keywords, offering its merchants micro loans, processing online payment transactions for the Counterfeit Products, and shipping the Counterfeit Products to consumers.

c.   The Alibaba Defendants provided online marketing services to the Merchant Defendants whom the Alibaba Defendants knew and had reason to know were selling Counterfeit Products based on, *inter alia*, their monitoring of their "Gold Suppliers" and "Assessed Suppliers" which are selling Counterfeit Products and/or materials that they claim can be used to make Plaintiffs' Products, as well as their "data management platform, audience targeting, credit analysis, and detecting, monitoring and investigating traffic hijacking and fraudulent activities."

d.   The Alibaba Defendants control who may sell products on their platforms, and online merchants are required to verify their identity before they are allowed to list their products and services on the Alibaba Marketplaces.

270.   The Alibaba Defendants' actions described above have caused and are likely to cause confusion and mistake and to deceive potential customers and the general purchasing public as to the source, origin, or sponsorship of the Counterfeit Products, and are likely to deceive the public into believing that the Counterfeit Products sold through the Merchant Defendants, which received services from the Alibaba Defendants, originate from, are associated with, or are otherwise authorized by Plaintiffs, all to the damage and detriment of Plaintiffs' reputations, goodwill, and sales.

271.   The Alibaba Defendants are therefore contributorily liable for the infringement and counterfeit use of Plaintiffs' Marks by the Merchant Defendants who operated by means of

the Alibaba Defendants' online marketing, financing, shipping, payment processing, and/or escrow services in connection with their sale of Counterfeit Products.

272.    Plaintiffs have been damaged by the Alibaba Defendants' contributory infringement in an amount to be determined at trial.  For example and without limitation, the Alibaba Defendants have been unjustly enriched through the Alibaba Marketplaces' merchants' unlawful and unauthorized sales of Counterfeit Products, for which the Alibaba Defendants receive income and/or transaction fees.

273.    Plaintiffs have been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' actions.

274.    Plaintiffs have no adequate remedy at law for the foregoing wrongful conduct.

**FOURTH CAUSE OF ACTION**
**AGAINST THE ALIBABA DEFENDANTS**
(False Representation Under Section 43(a)
of the Lanham Act, 15 U.S.C. § 1125(a))

275.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

276.    As a result of the experience, care, and service of Plaintiffs in producing and providing Plaintiffs' Products, these products have become widely known and have acquired a worldwide reputation for excellence.  Moreover, Plaintiffs' Marks have become associated with Plaintiffs' Products, and have come to symbolize the reputation for quality and excellence associated with Plaintiffs and authentic products produced by Plaintiffs.  As such, Plaintiffs' Marks have attained secondary meaning.  Plaintiffs' Marks are also inherently distinctive.

277.    Defendants' use of Plaintiffs' Marks on or in connection with the Counterfeit Products, as alleged above, is likely to confuse, mislead, or deceive customers, purchasers, and members of the general public as to the origin, source, sponsorship, or affiliation of the

Counterfeit Products, and is likely to cause such people to believe in error that the Counterfeit Products have been authorized, sponsored, approved, endorsed, or licensed by Plaintiffs, or that Defendants are in some way affiliated with Plaintiffs.

278.    Defendants' actions, including but not limited to their unauthorized use in commerce of Plaintiffs' Marks, constitute a false designation of origin, false and misleading descriptions of fact, and false and misleading representations of fact, which have caused, and are likely to cause, confusion, mistake, and deception, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

279.    Defendants' actions as described above, including their unauthorized, false, and misleading use in commerce of Plaintiffs' Marks on Counterfeit Products and other uses of Plaintiffs' Marks in interstate commerce, have caused, and unless restrained will continue to cause, great and irreparable injury to Plaintiffs, and to the business and goodwill represented by Plaintiffs' Marks in an amount that cannot presently be ascertained, leaving Plaintiffs with no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**AGAINST THE ALIBABA DEFENDANTS**
(Trademark Dilution Under Section 43(c)
of the Lanham Act, 15 U.S.C. § 1125(c))

280.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

281.    Plaintiffs' Marks are famous within the meaning of the Trademark Dilution Revision Act of 2006.  Among other things:  (1) Plaintiffs' Marks have a high degree of inherent distinctiveness; (2) Plaintiffs' Marks have been used continuously for decades throughout the United States to promote many goods and services; (3) Plaintiffs and their authorized licensees have advertised and publicized Plaintiffs' Marks continuously for decades throughout the United

States; (4) Plaintiffs have used their respective trademarks in a trading area of broad geographical scope encompassing all of the states and territories of the United States; (5) Plaintiffs' Marks are among the preeminent marks in the luxury goods market; (6) Plaintiffs' Marks have an extremely high degree of recognition among consumers; (7) there are no trademarks similar to those of Plaintiffs; and (8) many of Plaintiffs' Marks are the subject of valid and subsisting registrations under the Lanham Act on the Principal Register.

282.    Because Plaintiffs' Products have gained a reputation for superior quality and excellence, Plaintiffs' Marks have gained substantial renown and reputation.

283.    Defendants' use of Plaintiffs' Marks is likely to cause blurring to and of Plaintiffs' Marks and impair the distinctiveness of Plaintiffs' Marks.  Consumers are likely to associate Defendants' uses of Plaintiffs' Marks with the Plaintiffs' Marks themselves because of the similarity between Defendants' use of Plaintiffs' Marks and Plaintiffs' Marks themselves.  In particular, the following factors make dilution by blurring likely:  (1) Defendants are making uses of Plaintiffs' Marks themselves; (2) Plaintiffs' Marks have acquired tremendous distinctiveness through Plaintiffs' continuous promotion and uses of Plaintiffs' Marks; (3) Plaintiffs' Marks have become famous and achieved a high level of recognition among the consuming public; (4) Plaintiffs' commercial use of Plaintiffs' Marks is substantially exclusive to Plaintiffs and its agents and licensees; (5) Defendants intend to create an association between Defendants' uses of Plaintiffs' Marks and Plaintiffs' Marks themselves; and (6) on information and belief, many consumers actually associate Defendants' uses of Plaintiffs' Marks confusingly similar thereto with Plaintiffs' Marks themselves.

284.    Defendants' conduct as alleged above is also likely to cause tarnishment among Plaintiffs' Marks that harms the reputation of Plaintiffs because of the similarity between

Defendants' uses of Plaintiffs' Marks and Plaintiffs' Marks themselves.  In particular, the Counterfeit Products sold, offered for sale, and/or distributed by Defendants display Plaintiffs' Marks in a manner that is confusingly similar to Plaintiffs' Products and therefore mislead consumers to believe that Plaintiffs' Products are of low quality.

285.    Defendants' conduct described above dilutes, blurs, tarnishes, and whittles away at the distinctiveness of Plaintiffs' Marks, and has caused actual dilution and has detracted from the distinctiveness of the famous Plaintiffs' Marks with consequent damage to Plaintiffs and to the substantial business and goodwill symbolized by Plaintiffs' Marks in violation of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c).

286.    Defendants' acts of trademark dilution have caused and, unless restrained will continue to cause, great and irreparable injury to Plaintiffs, to Plaintiffs' Marks, and to the substantial business and goodwill represented thereby, in an amount that cannot be presently ascertained, leaving Plaintiffs with no adequate remedy at law.

287.    Defendants' conduct has been undertaken with a willful intent to trade on the reputation of Plaintiffs and to cause dilution of the famous Plaintiffs' Marks, and this conduct entitles Plaintiffs to damages and the other remedies available pursuant to 15 U.S.C. § 1125(c)(2).

## SIXTH CAUSE OF ACTION
## AGAINST THE ALIBABA DEFENDANTS
(Violations of Racketeer Influenced and Corrupt Organizations Act ("RICO")
18 U.S.C. § 1962(c))

288.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

289.    At all relevant times, each Plaintiff is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

290.    At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

## The RICO Enterprise

291.    The Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to herein as the "Enterprise."  Each of the Defendants participated in the operation or management of the Enterprise because they engaged in acts that they knew would further the scheme to sell and profit from the sale of counterfeit goods, and that they further intended to further that scheme, and exercised substantial discretion in doing so.

292.    The Enterprise consists of the Alibaba Defendants, the Merchant Defendants, and unidentified co-conspirators using the Alibaba Marketplaces who have joined together to form an enterprise in fact whose purpose is to sell and profit from the sale of counterfeit goods.  The Merchant Defendants knowingly manufactured and sold, among other counterfeit goods, Counterfeit Products bearing Plaintiffs' Marks, using the Alibaba Marketplaces and the Alibaba Defendants' services to effect such sales.  The Alibaba Defendants knowingly provided the Merchant Defendants with the online marketplaces and other services to facilitate the sale of counterfeit goods, including marketing, shipping, financing, and payment and/or escrow services that allowed the Merchant Defendants to transact their illegal sales of the Counterfeit Products, and the Alibaba Defendants derived substantial profits from such sales.

293.    Defendants and their co-conspirators, i.e., the manufacturers and sellers of counterfeit goods through the Alibaba Marketplaces, are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely, through a systematized operation to sell and profit from the sale of counterfeit goods including Counterfeit Products bearing Plaintiffs'

115

Marks.  These Defendants and their co-conspirators have organized their activities into a cohesive group with specific and assigned responsibilities and division of tasks, operating in the United States, China, and elsewhere.  Merchants including the Merchant Defendants have manufactured the goods for wholesale and retail distribution through the Alibaba Marketplaces. The Alibaba Defendants have developed their self-described "ecosystem" comprising various entities responsible for data collection and online marketing, financing, shipping, and payment processing services to promote and facilitate the sale of counterfeit goods.  While the membership of this Enterprise has changed over time, and its members may have held different roles at different times, the Enterprise has generally been structured to operate as a unit in order to accomplish the goals of the criminal scheme, profiting from the promotion and sale of counterfeit goods, including through the following acts:

    a. The Alibaba Defendants have participated in the operation and management of the Enterprise by knowingly facilitating the sale of counterfeit goods and materials to make counterfeit goods, including, *inter alia*, Counterfeit Products that bear Plaintiffs' Marks and copy the designs, patterns, and color schemes associated with Plaintiffs' Products, through the Alibaba Marketplaces. Specifically, the Alibaba Defendants knowingly provide counterfeiters with storefronts in the Alibaba Marketplaces and permit them to list their counterfeit goods for sale, permit known counterfeiters to continue selling counterfeits on the Alibaba Marketplaces' websites, sell federally-registered marks as keywords in order to attract consumers to counterfeit goods offered for sale by the Merchant Defendants, and insert additional terms and phrases into the metadata for searches performed on Alibaba.com in order to direct consumers to particular counterfeit

goods offered for sale.  In addition, the Alibaba Defendants have directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise—namely, processing payments for the sale of counterfeit goods, offering loan and escrow services to counterfeiters and their customers, and providing shipping and delivery services for counterfeit goods purchased through the Alibaba Marketplaces.  There can be no doubt that this is willful and intentional.  The Alibaba Defendants' knowledge is demonstrated by the obviously counterfeit nature of many of the goods sold on the Alibaba Marketplaces, Plaintiffs' repeated notifications to Defendants regarding the presence of Counterfeit Products on the Alibaba Marketplaces, the Alibaba Defendants' ineffective takedown procedures, their sale of keywords to counterfeiters resulting in prospective purchasers being directed to counterfeiters' storefronts in the Alibaba Marketplaces in response to specific keywords, the association of specific metadata with keywords to direct prospective purchasers to storefronts selling counterfeit merchandise, the facilitation of the purchase and sale of counterfeit goods through "Alisource Pro" representatives that match buyers and sellers of counterfeit goods, and their certification of specific sellers of counterfeit merchandise, including the Merchant Defendants, as "Gold" and "Assessed" suppliers, reflecting an inspection of such sellers' manufacturing facilities by the Alibaba Defendants or a third party authorized by the Alibaba Defendants for that purpose, and thus knowledge that such sellers were manufacturing and selling counterfeit goods.

b.  Defendant Alipay has also participated in the operation and management of the Enterprise by processing the transactions for the sale of counterfeit goods, conducting substantially all of the online payment processing for counterfeit goods purchased through the Alibaba Marketplaces and providing escrow services to consumers who purchase counterfeit goods through the Alibaba Marketplaces, including the Counterfeit Products described in the foregoing paragraphs of this Complaint.

c.  The Merchant Defendants have also participated in the operation and management of the Enterprise by manufacturing and distributing counterfeit goods, and offering for sale those counterfeit goods in the Alibaba Marketplaces.  The Merchant Defendants' knowledge and intent is demonstrated by their knowing and conscious manufacture and/or sale of counterfeit goods through the online Alibaba Marketplaces, and their repeated shipment of such goods to the United States and elsewhere.

d.  Unidentified co-conspirators have been integrally involved in various stages of the Defendants' criminal enterprise, directing, controlling, ratifying, facilitating, or otherwise participating in the manufacture, distribution, sale, and advertisement of counterfeit goods through the Alibaba Marketplaces.

294.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c), because Defendants have sold and continue to sell a substantial volume of counterfeit goods into the United States, causing harm to Plaintiffs in their business and property.

## Pattern of Racketeering Activity

295.    The Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).  This pattern included multiple instances of money laundering in violation of 18 U.S.C. § 1956, trafficking in counterfeit goods in violation of 18 U.S.C. § 2320(a)(1), and mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.   These predicate acts are all related to each other and to the Enterprise's purpose of selling and profiting from the sale of counterfeit goods.  Moreover, this pattern has been ongoing and will likely continue into the future.  Indeed, there are at least hundreds, if not thousands, of storefronts on the Alibaba Marketplaces now offering counterfeit goods for sale.  Each sale of Counterfeit Products, and each transfer of funds in payment for the purchase of Counterfeit Products, causes new injury to Plaintiffs in the form of brand dilution, loss of goodwill and lost sales, as set forth below, injuries that Plaintiffs would not have suffered but for the conduct of the Enterprise.

### Pattern of Racketeering Activity: Numerous Instances of Trafficking in Counterfeit Goods in Violation of 18 U.S.C. § 2320(a)(1)

296.    At all times material to this Complaint, Plaintiffs were engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

297.    As described herein, Defendants have engineered an organized operation to sell and profit from the sale of counterfeit goods through the Alibaba Marketplaces by, among other things, making, distributing, advertising, and selling goods upon which or in connection with which counterfeit marks—marks that are identical to, or substantially indistinguishable from, federally registered marks, the use of which is likely to cause confusion, mistake, or to deceive—are used.

298.     In furtherance of their scheme, and as described herein, Defendants transported, transferred, or otherwise disposed of—and attempted to transport, transfer, or otherwise dispose of—counterfeit goods sold through the Alibaba Marketplaces to their online purchasers in exchange for money, and/or made or obtained control of the counterfeit goods with intent to so transport, transfer, or dispose of.  Such counterfeit goods that Defendants transported, transferred, or otherwise disposed of, or made or obtained control of with intent to so transport, transfer, or dispose of, include, but are not limited to, Counterfeit Products bearing Plaintiffs' Marks and copying the designs, patterns, and color schemes associated with Plaintiffs' Products. While Plaintiffs contend that Defendants' sale and transport of such Counterfeit Products is vast in volume and will be revealed by discovery in this action, such sales and transport to the United States include at least the following instances:

a.   Sale of a counterfeit "Gucci" watch for shipment to the United States by Alibaba merchant Shenzhen Meigeer, purchased by Plaintiffs' investigator on or about June 26, 2014, through Alibaba.com.

b.   Sale and shipment to New York of a counterfeit "YSL" T-shirt by Alibaba merchant Fashion Zone, purchased by Plaintiffs' investigator on or about June 1, 2014, through AliExpress.com.

c.   Sale and shipment to the United States of a counterfeit "Gucci" bag by Alibaba merchant Star Factory, purchased by Plaintiffs' investigator on or about June 1, 2014, through AliExpress.com.

d.   Sale of a pair of counterfeit "Balenciaga" sandals for shipment to New York by Alibaba merchant Ladylidy Shop, purchased by Plaintiffs' investigator on or about May 31, 2014, through Taobao.com.

e.   Sale and shipment to New York of a counterfeit "Gucci" bag by Alibaba merchant Hong Kong Longitude and Latitude International Trading, purchased by Plaintiffs' investigator on or about June 19, 2014, through Taobao.com.

f.   Sale of a counterfeit "Bottega Veneta" wallet for shipment to New York by Alibaba merchant Coco Fashion Style, purchased by Plaintiffs' investigator on or about June 19, 2014, through Taobao.com.

g.   Sale and shipment to New York of a counterfeit "Gucci" bag by Alibaba merchant Huiming Leather Mall, purchased by Plaintiffs' investigator on or about June 19, 2014, through Taobao.com.

h.   Sale of a pair of counterfeit "Gucci" shoes for shipment to New York by Alibaba merchant Gucci Fashion Shop, purchased by Plaintiffs' investigator on or about June 2, 2014, through Taobao.com.

i.   Sale of a pair of counterfeit "Gucci" shoes for shipment to New York by Alibaba merchant VANCS Where Boutique, purchased by Plaintiffs' investigator on or about June 2, 2014, through Taobao.com.

j.   Sale of a counterfeit "Gucci" bag for shipment to New York by Alibaba merchant Spring Rain Leather Goods, purchased by Plaintiffs' investigator on or about June 2, 2014, through Taobao.com.

k.   Sale of a pair of counterfeit "Gucci" shoes for shipment to New York by Alibaba merchant Celebrity Shoe, purchased by Plaintiffs' investigator on or about June 2, 2014, through Taobao.com.

l.   Sale of a pair of counterfeit "Gucci" shoes for shipment to New York by Alibaba merchant Jinlong Luxury City, purchased by Plaintiffs' investigator on or about June 2, 2014, through Taobao.com.

299.   Defendants participated in the scheme knowing full well that the goods they were (1) transporting, transferring, or otherwise disposing of; (2) attempting to transport, transfer, or otherwise dispose of; and/or (3) making or obtaining control of with intent to so transport, transfer, or dispose of were counterfeit.  Defendants are engaged in a wide-ranging scheme to sell and profit from the sale of goods upon which or in connection with which counterfeit marks are knowingly used.

300.   Moreover, Defendants' participation in the scheme was intentional—Defendants intended to (1) transport, transfer, or otherwise dispose of; (2) attempt to transport, transfer, or otherwise dispose of; and/or (3) make or control goods known by them to be counterfeit.

301.   Accordingly, Defendants have unlawfully trafficked and attempted to traffic, as that term is defined in 18 U.S.C. § 2320(e)(2), in goods upon which or in connection with which counterfeit marks, as that term is defined in 18 U.S.C. § 2320(f)(1), were used, in violation of 18 U.S.C. § 2320(a)(1).

**Pattern of Racketeering Activity: Multiple Instances of Money Laundering in Violation of 18 U.S.C. § 1956**

302.   As described herein, the Enterprise has engaged in a scheme to sell and profit from the sale of counterfeit goods through the Alibaba Marketplaces by, among other things, making, distributing, advertising, and selling counterfeit goods to persons in the U.S. and elsewhere.  In furtherance of this scheme, the Enterprise has engaged in multiple counts of money laundering in violation of 18 U.S.C. § 1956(a)(2)(A).

303.    Defendant Alipay has on multiple occasions, acting in its individual capacity and as agent for the Alibaba Defendants, knowingly caused the transportation, transmission, and/or transfer of funds to and from the United States to itself and to the Alibaba Defendants, the Merchant Defendants, and other entities, in furtherance of the scheme to sell and profit from the sale of counterfeit goods, and with the intent that those funds be used to promote and further the scheme to traffic in counterfeit goods, with the intent that those funds be used to promote the carrying on of unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(A).  This unlawful activity includes but is not limited to the foregoing violations of 18 U.S.C. §§ 1341, 1343, and 2320(a)(1), including but not limited to furthering acts of counterfeiting and mail and wire fraud, such as the receipt and processing of payments made for counterfeit goods purchased through the Alibaba Marketplaces.  While Plaintiffs contend that there are a vast number of violations of 18 U.S.C. § 1956(a)(2)(A) that will be revealed through discovery in this action, these transmissions include payments from purchasers of counterfeit merchandise from the Alibaba Marketplaces by persons in the U.S., including at least the following instances:

a.   Sale and receipt of payment of $14.99  by the Alibaba merchant Fashion Zone from Plaintiffs' investigator located in the United States by means of  a Visa credit card, processed by Alipay, on or about June 1, 2014, for a counterfeit "YSL" T-shirt to be shipped to New York.

b.   Sale and receipt of payment of $9.90  by the Alibaba merchant Star Factory from Plaintiffs' investigator located in the United States by means of a Visa credit card, processed by Alipay, on or about June 1, 2014, for a counterfeit "Gucci" bag to be shipped to the United States.

c.  Sale and receipt of payment of approximately $52 by the Alibaba merchant
Ladylidy Shop from Plaintiffs' investigator located in the United States by means
of a Visa credit card, processed by Alipay, on or about May 31, 2014, for a pair of
counterfeit "Balenciaga" sandals to be shipped to New York.

d.  Sale and receipt of payment of approximately $202 by the Alibaba merchant
Hong Kong Longitude and Latitude International Trading from Plaintiffs'
investigator located in the United States by means of a Visa credit card, processed
by Alipay, for a counterfeit "Gucci" bag, to be shipped to New York.

e.  Sale and receipt of payment of approximately $42 by the Alibaba merchant Coco
Fashion Style from Plaintiffs' investigator located in the United States by means
of a Visa credit card, processed by Alipay, on or about June 19, 2014, for a
counterfeit "Bottega Veneta" wallet, to be shipped to New York.

f.  Sale and receipt of payment of approximately $209 by the Alibaba merchant
Huiming Leather Mall from Plaintiffs' investigator located in the United States by
means of a Visa credit card, processed by Alipay, on or about June 19, 2014, for a
counterfeit "Gucci" bag, to be shipped to New York.

g.  Sale and receipt of payment of approximately $53 by the Alibaba merchant Gucci
Fashion Shop from Plaintiffs' investigator located in the United States by means
of a Visa credit card, processed by Alipay, on or about June 2, 2014, for a pair of
counterfeit "Gucci" shoes, to be shipped to New York.

h.  Sale and receipt of payment of approximately $43 by the Alibaba merchant
VANCS Where Boutique from Plaintiffs' investigator located in the United States

by means of a Visa credit card, processed by Alipay, on or about June 2, 2014, for

a pair of counterfeit "Gucci" shoes, to be shipped to New York.

i.   Sale and receipt of payment of approximately $21 by the Alibaba merchant

Spring Rain Leather Goods from Plaintiffs' investigator located in the United

States by means of a Visa credit card, processed by Alipay, on or about June 2,

2014, for a counterfeit "Gucci" bag, to be shipped to New York.

j.   Sale and receipt of payment of approximately $48 by the Alibaba merchant

Celebrity Shoe from Plaintiffs' investigator by means of a Visa credit card,

processed by Alipay, on or about June 2, 2014, for a pair of counterfeit "Gucci"

shoes, to be shipped to New York.

**Pattern of Racketeering Activity: Multiple Instances of Mail Fraud in Violation of 18 U.S.C. § 1341**

304.   As described herein, the Enterprise has engaged in a scheme to sell and profit

from the sale of counterfeit goods through the Alibaba Marketplaces by, among other things,

making, distributing, advertising, and selling Counterfeit Products.  In furtherance of this

scheme, the Enterprise has engaged in multiple counts of mail fraud in violation of 18 U.S.C.

§ 1341.  Specifically, Defendants' misappropriation of Plaintiffs' intellectual property through

the promotion, sale, and shipment of Counterfeit Products for profit, constitutes a "scheme or

artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute,

supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation,

security, or other article, or anything represented to be or intimated or held out to be such

counterfeit or spurious article," within the meaning of Section 1341, and Defendants have

knowingly deposited Counterfeit Products for delivery by the U.S. Postal Service, or delivery by

other private or commercial interstate carries to locations within the United States, as well as engaging in other uses of the U.S. mails and private and commercial interstate carriers in furtherance of this scheme, as will be revealed in discovery in this action.  By means of this scheme, Defendants have (1) obtained money from consumers purchasing Counterfeit Products because of their misappropriation of Plaintiffs' Marks; and (2) wrongfully obtained the value of Plaintiffs' intellectual property through the sale of Counterfeit Products.  This conduct has directly harmed both consumers and Plaintiffs by sowing confusion among consumers seeking authentic Plaintiffs' Products and post-sale confusion among consumers who come in contact with the Counterfeit Products and associate their inferior quality with Plaintiffs' Marks.

305.    As evidenced by the routine nature of Defendants' promotion and sale of Counterfeit Products and the volume of traffic experienced by the Alibaba Marketplaces, Plaintiffs' believe that the actual volume of Defendants' sales and shipments of Counterfeit Products to customers in the United States and elsewhere is vast and will be revealed in discovery in this action, but such sales and shipments include at least the following specific instances:

   a.   Shipment to New York of a counterfeit "YSL" T-shirt by Alibaba merchant
        Fashion Zone, purchased by Plaintiffs' investigator on or about June 1, 2014, by
        means of Express Mail Service ("EMS") (China's worldwide express mail
        service) and the U.S. Postal Service.

   b.   Shipment to Texas of a counterfeit "Gucci" bag by Alibaba merchant Star
        Factory, purchased by Plaintiffs' investigator on or about June 1, 2014, by means
        of EMS and the U.S. Postal Service.

     c.    Shipment to New York of a counterfeit "Gucci" bag by Alibaba merchant Hong

          Kong Longitude and Latitude International Trading, purchased by Plaintiffs'

          investigator on or about June 19, 2014, by means of EMS and the U.S. Postal

          Service.

     d.    Shipment to New York of a counterfeit "Gucci" bag by Alibaba merchant

          Huiming Leather Mall, purchased by Plaintiffs' investigator on or about June 19,

          2014, by means of EMS and the U.S. Postal Service.

306.    Defendants participated in the scheme knowingly, willfully, and with the specific intent to sell and profit from the sale of Counterfeit Products and to use the U.S. Postal Service and private or commercial interstate carriers to effect that scheme, in violation of  18 U.S.C. § 1341.

**Pattern of Racketeering Activity: Multiple Instances of Wire Fraud in Violation of 18 U.S.C. § 1343**

307.    As described herein, the Enterprise has engaged in a scheme to sell and profit from the sale of counterfeit goods through the Alibaba Marketplaces by, among other things, making, distributing, advertising, and selling Counterfeit Products.  In furtherance of this scheme, the Enterprise has engaged in multiple counts of wire fraud in violation of 18 U.S.C. § 1343. Specifically, Defendants' misappropriation of Plaintiffs' intellectual property through the promotion, sale, and shipment of Counterfeit Products for profit, constitutes a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," within the meaning of Section 1343, and Defendants have knowingly transmitted or caused to be transmitted by means of wire communication in interstate and foreign commerce multiple communications for the purpose of executing this scheme, specifically through the operation of interactive websites used to promote and sell Counterfeit

Products, including specifically targeting consumers in the United States, and by means of electronic communications used to facilitate and complete such sales with consumers in the United States and elsewhere.  By means of this scheme, Defendants have (1) obtained money from consumers purchasing Counterfeit Products because of their misappropriation of Plaintiffs' Marks; and (2) wrongfully obtained the value of Plaintiffs' intellectual property through the sale of Counterfeit Products.  This conduct has directly harmed both consumers and Plaintiffs by sowing confusion among consumers seeking authentic Plaintiffs' Products and post-sale confusion among consumers who come in contact with the Counterfeit Products and associate their inferior quality with Plaintiffs' Marks.

308.    As evidenced by the routine nature of Defendants' promotion and sale of counterfeit items and the volume of traffic experienced by the Alibaba Marketplaces, Plaintiffs' believe that the actual volume of Defendants' use of the sales and shipments of Counterfeit Products to customers in the United States and elsewhere is vast and will be revealed in discovery in this action, but such sales and shipments include at least the following specific instances:

a.  Sale through Alibaba.com of a counterfeit "Gucci" watch to be shipped to New York by Alibaba merchant Shenzhen Meigeer and receipt of payment of approximately $130 by means of Western Union, on or about June 26, 2014.

b.  Sale through AliExpress.com of a counterfeit "YSL" T-shirt to be shipped to New York by Alibaba merchant Fashion Zone and receipt of payment of approximately $14.99 by means of a Visa credit card, processed by Alipay, on or about June 1, 2014.

c.  Sale through AliExpress.com of a counterfeit "Gucci" bag to be shipped to Texas by Alibaba merchant Star Factory and receipt of payment of approximately $9.90 by means of a Visa credit card, processed by Alipay, on or about June 1, 2014.

d.  Sale through Taobao.com of a pair of counterfeit "Balenciaga" sandals to be shipped to New York by Alibaba merchant Ladylidy Shop and receipt of payment through Taobao.com of approximately $52 by means of a Visa credit card, processed by Alipay, on or about May 31, 2014.

e.  Sale through Taobao.com of a counterfeit "Gucci" bag, to be shipped to New York by Alibaba merchant Hong Kong Longitude and Latitude International Trading and receipt of payment through Taobao.com of approximately $202 by means of a Visa credit card, processed by Alipay, on or about June 19, 2014.

f.  Sale through Taobao.com of a counterfeit "Bottega Veneta" wallet to be shipped to New York by Alibaba merchant Coco Fashion Style and receipt of payment of approximately $202 by means of a Visa credit card, processed by Alipay, on or about June 19 2014.

g.  Sale through Taobao.com of a counterfeit "Gucci" bag to be shipped to New York by Alibaba merchant Huiming Leather Mall and receipt of payment of approximately $209 by means of a Visa credit card, processed by Alipay, on or about June 19, 2014.

h.  Sale through Taobao.com of a pair of counterfeit "Gucci" shoes for shipment to New York by Alibaba merchant Gucci Fashion Shop and receipt of payment of approximately $53 by means of a Visa credit card, processed by Alipay, on or about June 2, 2014.

i.   Sale through Taobao.com of a pair of counterfeit "Gucci" shoes for shipment to New York by Alibaba merchant VANCS Where Boutique and receipt of payment of approximately $43 by means of a Visa credit card, processed by Alipay, on or about June 2, 2014.

j.   Sale through Taobao.com of a counterfeit "Gucci" bag for shipment to New York by Alibaba merchant Spring Rain Leather Goods and receipt of payment of approximately $21 by means of a Visa credit card, processed by Alipay, on or about June 2, 2014.

k.   Sale through Taobao.com of a pair of counterfeit "Gucci" shoes for shipment to New York by Alibaba merchant Celebrity Shoe and receipt of payment of approximately $48 by means of a Visa credit card, processed by Alipay, on or about June 2, 2014.

l.   Sale through Taobao.com of a pair of counterfeit "Gucci" shoes for shipment to New York by Alibaba merchant Jinlong Luxury City and receipt of payment of approximately $56 by means of a Visa credit card, processed by Alipay, on or about June 2, 2014.

309.   Defendants participated in the scheme knowingly, willfully, and with the specific intent to sell and profit from the sale of counterfeit goods and to use the wires in interstate and foreign commerce to effect this scheme, in violation of  18 U.S.C. § 1343.

**Summary of the Pattern of Racketeering Activity Alleged Against Each RICO Defendant**

310.   The Alibaba Defendants have committed numerous counterfeiting violations— intentionally trafficking or causing to traffic counterfeit goods, conspiring to traffic counterfeit goods, and aiding and abetting the trafficking of counterfeit goods—all in furtherance of Defendants' organized operation to sell and profit from the sale of counterfeit goods, including

the Counterfeit Products bearing Plaintiffs' Marks.  The Alibaba Defendants have also committed numerous mail and wire fraud violations, in which the Alibaba Defendants used or caused to be used the mail or wires in furtherance of Defendants' wide-spread scheme to sell and profit from the sale of counterfeit goods.

311.    Defendant Alipay has committed numerous predicate acts, including mail and wire fraud and trafficking in counterfeit goods.  Alipay used or caused to be used the mail or wires in furtherance of Defendants' wide-spread scheme to sell and profit from the sale of counterfeit goods, including the Counterfeit Products bearing Plaintiffs' Marks.  In addition, Alipay has both conspired to traffic in counterfeit goods and aided and abetted the trafficking of counterfeit goods in furtherance of Defendants' organized operation to sell and profit from the sale of counterfeit goods.

312.    The Merchant Defendants have committed numerous counterfeiting violations— intentionally trafficking or causing to traffic counterfeit goods, conspiring to traffic counterfeit goods, and aiding and abetting the trafficking of counterfeit goods, including the Counterfeit Products bearing Plaintiffs' Marks, all in furtherance of Defendants' organized operation to sell and profit from the sale of counterfeit goods.  The Merchant Defendants have also committed numerous mail and wire fraud violations, including without limitation website postings and online advertising of counterfeit goods for sale, in which the Merchant Defendants used or caused to be used the mail or wires in furtherance of Defendants' wide-spread scheme to sell and profit from the sale of counterfeit goods.

313.    Each of the Defendants has engaged in multiple predicate acts, including trafficking in counterfeit goods, and engaging in mail and wire fraud and money laundering in order to effectuate such sales, as described in the foregoing paragraphs.  The conduct of each of

the Defendants described in the foregoing paragraphs constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

314.    Plaintiffs have been injured in their businesses and property by reason of Defendants' violations of 18 U.S.C. § 1962(c).  The injuries to Plaintiffs caused by reason of the violations of 18 U.S.C. § 1962(c) include but are not limited to damage to the value of Plaintiffs' intellectual property and other assets, lost sales, and direct expenses from Plaintiffs' efforts to stop the sale of Counterfeit Products through the Alibaba Defendants' ineffective takedown procedures.  More specifically, Defendants' racketeering activities have caused damage to Plaintiffs' reputations, goodwill, and sales, including but not limited to lost sales from customers that would have purchased genuine items but for the availability of cheaper counterfeits, and prospective customers who choose not to purchase Plaintiffs' Products because of the availability of inferior counterfeits.  Further, these injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962(c), and Defendants' conduct is the direct and but for cause of these injuries.  Furthermore, each new sale of Counterfeit Products, and each new commission of one of the predicate acts identified above, causes new injuries to Plaintiffs.

315.    Given the organized and pervasive nature of the Enterprise's promotion and sale of Counterfeit Products, and the Enterprise's continued and ongoing operations, which are likely to extend into the future, Plaintiffs have been and will continue to be injured in their businesses and property in an amount to be determined at trial.

316.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

317.    Plaintiffs are further entitled to, and should be awarded, a permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them from directly or indirectly contributing to, aiding, or abetting the marketing, promotion, or sale of Counterfeit Products or any unauthorized or counterfeit products that bear, contain, display, or utilize any of Plaintiffs' Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from Plaintiffs' Marks.

### SEVENTH CAUSE OF ACTION
### AGAINST THE ALIBABA DEFENDANTS
(Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))

318.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein, and in particular incorporate as if fully set forth herein Plaintiffs' Sixth Cause of Action.

319.    Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above in Plaintiffs' Sixth Cause of Action, in violation of 18 U.S.C. § 1962(d).

320.    Defendants knew and should have known that they were engaged in a conspiracy to sell and profit from the sale of counterfeit goods, and knew and should have known that in the course of that conspiracy, Counterfeit Products would be manufactured, promoted and sold in the Alibaba Marketplaces, with the assistance of keyword searches and otherwise, that funds would be transferred to and from the United States as a result of and in furtherance of the sale of counterfeit goods, and that the Counterfeit Products would be shipped to the United States and elsewhere as a result of and in furtherance of such sales, in violation of 18 U.S.C. §§ 1341, 1343, 1956, and  2320(a)(1), to traffic in counterfeit goods and profit from the sale of counterfeit goods, and that the participation and agreement of each of them was necessary to allow the

commission of this pattern of racketeering activity. They furthermore agreed to engage in this scheme together as evidenced by the Alibaba Defendants' provision of online marketplaces and other services to the Merchant Defendants, and support of the Merchant Defendants' businesses through the provision of many other services, as set forth in this Complaint. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

321. The Alibaba Defendants' knowledge, intent, and agreement to engage in the scheme to promote and sell Counterfeit Products is demonstrated by the obviously counterfeit nature of many of the goods sold on the Alibaba Marketplaces, Plaintiffs' repeated notifications to Defendants regarding the presence of Counterfeit Products on the Alibaba Marketplaces, the Alibaba Defendants' ineffective takedown procedures, their sale of keywords to counterfeiters resulting in prospective purchasers being directed to counterfeiters' storefronts in the Alibaba Marketplaces in response to specific keywords, the association of specific metadata by the Alibaba Defendants with keywords to direct prospective purchasers to storefronts selling counterfeit merchandise, the facilitation of the purchase and sale of counterfeit goods through "Alisource Pro" representatives that match buyers and sellers of counterfeit goods, and their certification of specific sellers of counterfeit merchandise, including the Merchant Defendants, as "Gold" and "Assessed" suppliers, reflecting an inspection of such sellers' manufacturing facilities by the Alibaba Defendants or a third party, and thus knowledge that such sellers were manufacturing and selling counterfeit goods. The Merchant Defendants' knowledge, intent, and agreement to engage in the promotion and sale of Counterfeit Products is demonstrated by their knowing and conscious manufacture and/or sale of counterfeit goods through the online Alibaba Marketplaces, and their repeated shipment of such goods to the United States and elsewhere.

322.    As a direct and proximate result of Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of  18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property, including damage to Plaintiffs' reputation, goodwill, and sales, including but not limited to lost sales from customers that would have purchased genuine items but for the availability of cheaper counterfeits and prospective customers who choose not to purchase Plaintiffs' genuine goods because of the availability of inferior counterfeits, and expenses incurred by Plaintiffs to remove Counterfeit Products from the Alibaba Marketplaces through the Alibaba Defendants' ineffective takedown procedures.  Further, these injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962(d), and Defendants' conduct is the direct cause of these injuries.  Furthermore, each new sale of Counterfeit Products, and each new commission of one of the predicate acts identified above, causes new injuries to Plaintiffs.

323.    Given the organized and pervasive nature of the Enterprise's promotion and sale of Counterfeit Products, and the Enterprise's continued and ongoing operations, which are likely to extend into the future, Plaintiffs have been and will continue to be injured in their businesses and property in an amount to be determined at trial.

324.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

325.    Plaintiffs are further entitled to, and should be awarded, a permanent injunction that enjoins Defendants, their co-conspirators and assignees, and anyone else acting in concert with them from directly or indirectly contributing to, aiding, or abetting the marketing, promotion, or sale of Counterfeit Products or any unauthorized or counterfeit products that bear,

contain, display, or utilize any of Plaintiffs' Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from Plaintiffs' Marks.

### EIGHTH CAUSE OF ACTION
### AGAINST THE ALIBABA DEFENDANTS
(Trademark Infringement Under New York Law)

326.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

327.    Defendants' acts as described above constitute trademark infringement under New York state common and/or statutory law.  N.Y. Gen. Bus. Law §§ 360-k, 360-o.

### NINTH CAUSE OF ACTION
### AGAINST THE ALIBABA DEFENDANTS
(Unfair Competition Under New York Law)

328.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

329.    Defendants' acts as described above constitute unfair competition under New York State common law, as preserved by N.Y. Gen. Bus. Law § 360-o.

### TENTH CAUSE OF ACTION
### AGAINST THE ALIBABA DEFENDANTS
(Trademark Dilution Under New York Law)

330.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

331.    Defendants' acts as described above dilute and detract from the distinctiveness of the famous Plaintiffs' Marks, resulting in damage to Plaintiffs and the substantial business and goodwill symbolized by Plaintiffs' Marks in violation of New York's Anti-Dilution Statute, N.Y. Gen. Bus. Law § 360-l.

**ELEVENTH CAUSE OF ACTION**
**AGAINST THE ALIBABA DEFENDANTS**
(Deceptive Acts and Practices Under New York Statutory Law)

332.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

333.    Defendants' acts as described above constitute deceptive acts and practices and false advertising in violation of N.Y. Gen. Bus. Law §§ 349-350.

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Permanently enjoin the Alibaba Defendants, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participation with any of them from:

> (a)    manufacturing, distributing, delivering, shipping, importing, exporting, advertising, marketing, promoting, selling, or otherwise offering for sale Counterfeit Products or any other products confusingly similar to Plaintiffs' Products, or that otherwise bear, contain, display, or utilize any of Plaintiffs' Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from the Plaintiffs' Marks;

> (b)    processing credit card transactions or otherwise facilitating the sales of Counterfeit Products or any other products confusingly similar to Plaintiffs' Products, or that otherwise bear, contain, display, or utilize any of Plaintiffs' Marks, any derivation or colorable imitation thereof, or any

mark confusingly similar thereto or likely to dilute or detract from the Plaintiffs' Marks;

(c)      making or employing any other commercial use of Plaintiffs' Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from the Plaintiffs' Marks;

(d)      using any other false designation of origin or false description or representation or any other thing calculated or likely to cause confusion or mistake in the mind of the trade or public or to deceive the trade or public into believing that Defendants' products or activities are in any way sponsored, licensed or authorized by or affiliated or connected with Plaintiffs; and

(e)      doing any other acts or things calculated or likely to cause confusion or mistake in the mind of the public or to lead purchasers or consumers or investors into the belief that the products or services promoted, offered, or sponsored by Defendants come from Plaintiffs or their licensees, or are somehow licensed, sponsored, endorsed, or authorized by, or otherwise affiliated or connected with Plaintiffs; and

(f)      moving, returning, or otherwise disposing of, in any manner, any Counterfeit Products or any other products confusingly similar to Plaintiffs' Products, or that otherwise bear, contain, display, or utilize any of Plaintiffs' Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from the Plaintiffs' Marks; and

(g)     secreting, destroying, altering, removing, or otherwise dealing with the unauthorized products or any books or records which contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting, or displaying of all unauthorized products which infringe Plaintiffs' Marks; and

(h)     further diluting and infringing all Plaintiffs' Marks and damaging Plaintiffs' goodwill; and

(i)     otherwise competing unfairly with Plaintiffs or any of their authorized licensees in any manner; and

(j)     assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs (a) through (i), or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (i).

2.      Exercise the Court's inherent equitable authority and its statutory equitable authority under 15 U.S.C. § 1116 to direct Defendants to account to Plaintiffs for the profits obtained through the unlawful activities alleged herein and unjust enrichment obtained through the unauthorized use of Plaintiffs' Marks.

3.      Order that the Plaintiffs recover their damages arising out of the acts of deception and infringement described above, and a sum equal to three times such profits or damages (whichever is greater), pursuant to 15 U.S.C. § 1117(a) and (b);

4.      Award Plaintiffs statutory damages in an amount to be determined representing $2 million per counterfeit mark per type of goods or services sold, offered for sale, or distributed, pursuant to 15 U.S.C. § 1117(c);

5.      Award Plaintiffs treble damages in an amount to be determined plus costs and attorneys' fees from Defendants pursuant to 18 U.S.C. § 1964(c).

6.      Award Plaintiffs punitive damages pursuant to New York State common law (as preserved by N.Y. Gen. Bus. Law § 360-o) on account of Defendants' gross, wanton, willful, and malicious conduct;

7.      Direct Defendants to recall and remove from all websites, online markets, or other channels of commerce any Counterfeit Products or any other products confusingly similar to Plaintiffs' Products, or that otherwise bear, contain, display, or utilize any of Plaintiffs' Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from the Plaintiffs' Marks, that are in Defendants' possession or control, and all means of making the same;

8.      Direct Defendants to deliver up for destruction all Counterfeit Products or any other products confusingly similar to Plaintiffs' Products, or that otherwise bear, contain, display or utilize any of Plaintiffs' Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from the Plaintiffs' Marks, that are in Defendants' possession or control, and all means of making the same, in accordance with 15 U.S.C. § 1118;

9.      Direct Defendants to deliver up for destruction any and all guarantees, circulars, price lists, labels, signs, prints, packages, wrappers, pouches, receptacles, advertising matter, promotional, and other materials in the possession or control of Defendants bearing any of

Plaintiffs' Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from Plaintiffs' Marks, in accordance with 15 U.S.C. § 1118;

10.     Direct Defendants to supply Plaintiffs with a complete list of entities from whom they collected and to whom they distributed and/or sold Counterfeit Products or any other products confusingly similar to Plaintiffs' Products, or that otherwise bear, contain, display or utilize any of Plaintiffs' Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from Plaintiffs' Marks, and to provide documentation of the manner through which the Counterfeit Products or other products were paid, including any bank accounts to, through, or from which funds were wired;

11.     Direct Defendants to file with the Court and serve on counsel for Plaintiffs within thirty (30) days after entry of any injunction issued by the Court in this action, a sworn written statement pursuant to 15 U.S.C. § 1116(a) setting forth in detail the manner and form in which Defendants have complied with any injunction which the Court may enter in this action;

12.     Award Plaintiffs their reasonable attorneys' fees along with the costs and disbursements incurred herein as a result of Defendants' intentional and willful infringement, pursuant to 15 U.S.C. § 1117 and N.Y. Gen. Bus. Law § 349(h);

13.     Award Plaintiffs such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

14.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all issues so triable.

Dated:  New York, New York
        May 15, 2015

Respectfully submitted,
GIBSON, DUNN & CRUTCHER

By: _____
  Robert Weigel
  Howard S. Hogan
  Alison L. Wollin
  Anne M. Coyle

200 Park Avenue, 47th Floor
New York, New York 10166
(212) 351-4000
rweigel@gibsondunn.com
*Attorneys for Plaintiffs Gucci America, Inc.,*
*Balenciaga S.A., Balenciaga America, Inc., Bottega*
*Veneta S.A., Bottega Veneta Inc., Yves Saint*
*Laurent America, Inc., Luxury Goods International*
*(L.G.I.) S.A., and Kering S.A.*